[Cite as *In re K.Z.*, 2019-Ohio-707.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 107269**

**IN RE K.Z.**

[Appeal By: N.Z., Mother]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Common Pleas Court
Juvenile Division
Case No. AD 16915692

**BEFORE:** E.A. Gallagher, J., Celebrezze, P.J., and Jones, J.

**RELEASED AND JOURNALIZED:** February 28, 2019

**ATTORNEY FOR APPELLANT**

Jonathan N. Garver
4403 St. Clair Avenue
Cleveland, Ohio 44103

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Brittany E. Pukita Leach
Assistant Prosecuting Attorney
Cuyahoga County Division of Children and Family Services
4261 Fulton Parkway
Cleveland, Ohio   44144

By: Cheryl Rice
Assistant Prosecuting Attorney
Cuyahoga County Division of Children and Family Services
3955 Euclid Avenue
Cleveland, Ohio   44115

**ALSO LISTED**

**GUARDIAN AD LITEM**

James Schultz, Jr.
55 Public Square, Suite 1700
Cleveland, Ohio 44113


EILEEN A. GALLAGHER, J.:

{¶1} Appellant-mother N.Z. ("Mother") appeals from the decision of the Juvenile Division of the Cuyahoga County Court of Common Pleas (the "juvenile court") terminating her parental rights and granting permanent custody of her son, K.Z., to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency").  For the reasons that follow, we affirm.

**Factual and Procedural Background**

{¶2} K.Z. was born on September 16, 2016. On October 26, 2016, CCDCFS filed a complaint alleging that K.Z. was abused (and that his then five-year-old brother, K.A., was dependent) and seeking a disposition of temporary custody to CCDCFS. Specifically, the complaint alleged that when K.Z. was born, he tested positive for heroin and experienced withdrawal symptoms for more than two weeks. The complaint further alleged that (1) when K.Z. was born, Mother tested positive for heroin, codeine, methadone and morphine, (2) Mother has a substance abuse problem that prevents her from providing adequate care for her children, (3) Mother abused heroin at least every third day during her pregnancy with K.Z., (4) Mother had been observed falling asleep while feeding and holding K.Z. and (5) the alleged father had failed to establish paternity or to consistently support, visit or communicate with the children. CCDCFS also filed a motion for predispositional temporary custody of K.Z. The juvenile court granted the emergency temporary custody of K.Z. to CCDCFS and K.Z. was placed in foster care. K.A. remained with Mother under protective supervision. A guardian ad litem was also appointed for the children.

{¶3} On November 21, 2016, CCDCFS filed a case plan. The case plan required Mother (1) to undergo a drug and alcohol assessment and successfully complete drug treatment and aftercare, (2) to submit to random drug screens and maintain a drug-free lifestyle, (3) to undergo a mental health assessment and comply with any recommended counseling or medications, (4) to become involved in "non-drug using" support groups, (5) to obtain stable, safe and appropriate housing, (6) to ensure that her children's basic needs, including food, clothing, shelter and medical care, were met and (7) to ensure that K.A. attended school regularly. The case plan further provided that Mother would be permitted to have weekly visits with K.Z. after she completed heart monitor training. The stated permanency goal was reunification.

## K.Z. Committed to Temporary Custody of CCDCFS

{¶4} On January 13, 2017, the guardian ad litem submitted his first report. The guardian ad litem reported that he had received a letter indicating that Mother had been in drug treatment at the Cleveland Treatment Center since October 30, 2015, but that he had no information regarding Mother's attendance or progress. He further reported that, according to CCDCFS, Mother had admitted to using heroin at least every third day during her pregnancy with K.Z. and that although Mother claimed to have last used heroin on September 15, 2016, she tested positive for heroin on October 3 and 10, 2016. He indicated that he had not yet been able to visit Mother's home because the telephone numbers he had been given for Mother did not work.

{¶5} With respect to K.Z., the guardian ad litem reported that K.Z. was born with premature apnea and that when he was first placed in foster care, he had a heart monitor and was being administered caffeine. Although he no longer needed the heart monitor or caffeine, the foster mother informed him that K.Z. had developed some additional health problems, including acid reflux and vision issues. According to the foster mother, Mother had only seen K.Z. three times since his discharge from the hospital — at doctor's appointments — but that there had been confusion regarding whether Mother had to be trained on the heart monitor before she could have regular visits with K.Z. The foster mother indicated that Mother had been recently trained on the heart monitor, removing this hurdle to visitation. Based on his investigation to date, the guardian ad litem recommended that temporary custody of both K.A. and K.Z. be granted to CCDCFS.

{¶6} Mother admitted the allegations of an amended complaint,[1] and on February 1, 2017, the juvenile court found K.Z. to be abused. On February 7, 2017, K.Z. was committed to the

---

[1]Specifically, Mother admitted:

1.  On the date of K.Z.'s birth, both mother and K.Z. tested positive for heroin.

temporary custody of CCDCFS.   The juvenile court approved the agency's case plan, found that the agency had made reasonable efforts to make it possible for K.Z. to be reunified with Mother and also ordered Mother to attend three 12-step meetings each week, to submit to requested drug screens and to pay $50 per month in child support.

{¶7} On March 13, 2017, CCDCFS filed an amended case plan.   Under the amended case plan, Mother was required to (1) attend K.Z.'s medical appointments, (2) become actively involved with his treatment and (3) demonstrate her knowledge of the care required for K.Z. while interacting with him.   The stated permanency goal remained reunification.   In April 2017, the juvenile court approved the amended case plan.

**CCDCFS' Motion to Modify Temporary Custody to Permanent Custody**

{¶8} On October 4, 2017, CCDCFS filed a motion to modify temporary custody of K.Z. to permanent custody pursuant to R.C. 2151.413.   In support of the motion, the agency submitted an affidavit from Sierra Whatley, the CCDCFS child protective specialist (the "CCDCFS social worker") assigned to K.Z.'s case.   In her affidavit, Whatley stated, in relevant part, that Mother had been referred for intensive outpatient treatment four times a week with random drug screens; that she was discharged from that program in April 2017 after she tested positive for

---

        Mother also tested positive for codine [sic], methadone, and morphine at that time.

2.     Mother has a substance abuse problem, specifically heroin, [which] interferes with her ability to provide adequate care for the children.

3.     Alleged father * * * has failed to establish paternity and has failed to consistently support, visit, or communicate with the children.
       * * *

Reasonable efforts were made by the Cuyahoga County Division of Children and Family Services to prevent the removal of the children from the home, and removal is in the best interest of the child.

benzodiazepines three times; that Mother was immediately referred for inpatient drug treatment but did not begin treatment until August 23, 2017; that Mother had failed to obtain independent and stable housing; that Mother had attended only four of 50 medical appointments for K.Z. and does not know or understand how to care for his medical needs; that Mother had failed to complete a mental health assessment and that Mother had failed to visit K.Z. on a consistent basis. Whatley further stated that K.Z. had developed an attachment with his foster family and that his foster parents had indicated a desire to provide K.Z. with a permanent home.

{¶9} On October 19, 2017, the guardian ad litem submitted an updated report. He reported that Mother had successfully completed inpatient substance abuse treatment, that K.A. continued to reside with Mother and that K.A. had stayed with family friends while Mother was in inpatient treatment.

{¶10} The guardian ad litem further reported that, according to CCDCFS, Mother had not visited K.Z. since July 2017, had attended only four of 47 medical appointments and knew "little to nothing" about K.Z.'s medical conditions and care. He indicated that although Mother claimed to lack access to transportation, the CCDCFS social worker indicated that RTA bus service was available that would allow Mother to attend visits and medical appointments. He further indicated that according to the foster mother, Mother became frustrated and raised her voice when the foster mother attempted to educate her about K.Z.'s medical conditions. The guardian ad litem recommended continuing protective supervision of K.A., continuing temporary custody of K.Z. and scheduling CCDCFS' motion to modify temporary custody to permanent custody for a hearing.

**Mother's Motions**

{¶11} On October 23, 2017, Mother filed a motion to establish a temporary visitation/parenting time schedule at her residence. Mother alleged that she had attempted to be involved in K.Z.'s life but that, because she did not own a car, it was difficult for her to attend the visits scheduled by the CCDCFS social worker. She further asserted that if visits were held at Mother's residence, it would allow K.Z. to bond with his brother, K.A.

{¶12} CCDCFS opposed the motion. The agency asserted that Mother had no need for transportation to visit K.Z. because all visits with K.Z. occurred at a public library within walking distance of Mother's residence, that the agency had informed Mother that visits could take place after school hours so K.A. could attend scheduled visits with her and that Mother's home was not suitable for in-home visitation with K.Z. due to his medical issues. The agency also claimed that K.Z. would be at risk of physical injury if visitation were to occur at Mother's home due to a lack of supervision and based on a prior incident in which Mother fell asleep while holding K.Z. The court denied Mother's motion.

{¶13} On November 7, 2017, Mother filed a motion requesting that CCDCFS provide transportation so Mother could attend K.Z.'s medical appointments. Once again, CCDCFS opposed the motion, asserting that it does not provide transportation to medical appointments for any family and issues bus passes only when a parent needs to meet with a service provider for drug and alcohol assessments or drug screens — not for a parent's "daily use" where a child has multiple medical appointments each week. The agency also argued that Mother's motion should be denied because if she were to be reunified with K.Z., she would need to show that she could provide her own transportation for K.Z.'s medical appointments. Once again, the court denied Mother's motion.

{¶14} On November 21, 2017, the juvenile court arraigned Mother on the agency's motion to modify temporary custody to permanent custody. Mother indicated that she had no objection to the juvenile court's finding that the agency had made reasonable efforts to attempt to reunify Mother with K.Z. through its referrals for substance abuse and mental health services and referrals for basic needs. The court indicated that the permanency plan was reunification and that the concurrent permanency plan was permanent custody and adoption. The juvenile court also granted a six-month extension of protective supervision over K.A. based on the agreement of the parties and its determination that extension of protective supervision was in K.A.'s best interest.

{¶15} At the December 19, 2017 pretrial conference, the agency advised that it was ready for the court to set a hearing date for its motion for permanent custody. At the request of the guardian ad litem and Mother, the juvenile court agreed to set the hearing "out a little way" so the guardian ad litem could complete his investigation and Mother could have more time to comply with the case plan, particularly with regard to obtaining suitable housing for K.Z. and attending his medical appointments.[2]

{¶16} On February 13, 2018, Mother filed a first request for extension of temporary custody.[3] Mother requested that the court extend temporary custody of K.Z. for six months so that she could complete her case plan. Mother asserted that she had shown significant progress towards the completion of her case plan by taking a parenting class, having successfully completed an inpatient drug treatment program at the Hitchcock Center for Women, attending AA meetings

---

[2]The juvenile court originally scheduled the evidentiary hearing on the agency's motion to modify temporary custody to permanent custody for March 13, 2018. The hearing was later continued to April 25, 2018 at the request of the parties.

[3]As it relates to K.Z., this was actually Mother's second motion requesting a six-month extension to complete her case plan. On October 23, 2017, Mother filed a "motion for six month extension" to complete her case plan referencing both K.A. and K.Z. As it related to K.Z., that motion had not been ruled on by the time Mother filed her "first request for extension of temporary custody" in February 2018.

and attending three recent medical appointments for K.Z. She stated that she was still attempting to find appropriate housing and was also working on better managing her time with her children so that she could attend more of K.Z.'s medical appointments. She indicated that attending K.Z.'s medical appointments was challenging because (1) she has no driver's license due to a prior seizure, (2) the court denied her motion for transportation, (3) she has to take multiple buses to attend K.Z.'s appointments, (4) she has no control over when his appointments are scheduled and (5) she has to get K.A. to and from school.

**The Guardian ad Litem's Final Report**

{¶17} On March 6, 2018, the guardian ad litem submitted his final report and recommendation with respect to K.Z. He indicated that, according to CCDCFS, Mother's visits with K.Z. had been "sporadic," she attended "only a small percentage" of K.Z.'s medical appointments and she "really knows little to nothing about this child's medical conditions and the required case for them." The guardian ad litem reported that Mother had completed inpatient drug treatment, received mental health services and "reportedly attends meetings" but that she had failed to obtain safe and appropriate housing for K.Z. and that "[t]his ha[d] been an issue throughout the history of this case." The guardian ad litem stated that he had twice attempted to visit Mother's home. He indicated that Mother cancelled the first visit and never called him to reschedule it. He indicated that his second visit, on March 4, 2018, was unscheduled. He stated that "[t]hough it appeared people may have been present[,] no one answered the door." Although he had never seen Mother's home for himself, he indicated that the CCDCFS social worker had "expressed concerns about the condition of the home" to him and that she did not feel the home would be a safe environment for K.Z. due to the number of animals in, and lack of cleanliness of, the home.

{¶18} The guardian ad litem stated that he visited with the foster family on November 29, 2017 and that, at that time, K.Z. appeared "well cared for and happy." He indicated that the foster family gave him "written information with respect to [K.Z.]," including an explanation of K.Z.'s medical conditions and care requirements and information regarding mother's attendance at medical appointments. The guardian ad litem noted that K.Z. requires "a significant amount of care," including receipt of food through a gastronomy-tube ("g-tube") and electric pump, a special formula that varies with each feeding, monitoring of his feeding to ensure proper nutrition and to minimize the risk of aspiration and diarrhea, daily physical therapy and "very frequent doctor and medical provider appointments."

{¶19} The guardian ad litem stated that although Mother "had made some progress" on her case plan with respect to substance abuse and mental health, questions remained. He noted that Mother had come to court "out of it" and stated that she had not shown a "true commitment to her child" by missing visits and most medical appointments, failing to learn how to take care of K.Z.'s medical needs and failing to secure appropriate housing for K.Z. Based on these facts, the guardian ad litem opined that it would be in K.Z.'s best interest to award permanent custody to the agency.

{¶20} On April 18, 2018, Mother filed an amended motion to extend temporary custody or, in the alternative, for legal custody pursuant to R.C. 2151.353(A)(3).

**Hearing on CCDCFS' Motion to Modify Temporary Custody to Permanent Custody and Mother's Motion to Extend Temporary Custody**

{¶21} On April 25, 2018, the juvenile court held an evidentiary hearing on CCDCFS' motion to modify temporary custody to permanent custody, Mother's first request for extension of temporary custody and Mother's amended motion to extend temporary custody or, in the

alternative, for legal custody.[4]   Four witnesses testified in support of the agency's motion to modify temporary custody to permanent custody: Christen Conard, a nurse practitioner at University Hospitals Rainbow Babies and Children's Hospital Aerodigestive Clinic (the "aerodigestive clinic"), Sarah Weiss, a pediatric medical social worker at the aerodigestive clinic, Whatley, the CCDCFS social worker, and K.Z.'s foster mother, B.U.   K.Z.'s guardian ad litem also testified at the hearing.   At the time of the hearing, K.Z. was 19 months old.

**Testimony of CCDCFS' Witnesses**

**Representatives from the Aerodigestive Clinic**

{¶22} Conard testified that K.Z. was referred to the aerodigestive clinic, a multi-disciplinary clinic that specializes in assisting children with breathing, swallowing and digestive conditions, because he was experiencing chronic vomiting and noisy breathing.   She testified that K.Z. attended his first aerodigestive clinic on August 28, 2017.[5]

{¶23} Conard testified that, to address K.Z.'s eating difficulties, a g-tube was inserted in K.Z.'s abdomen and another surgical procedure, a Nissen, was performed to help prevent reflux. She indicated that because K.Z. is at risk for aspiration, all liquids he ingests by mouth must be thickened to a certain consistency to avoid liquid going into his windpipe.   She stated that he also requires overnight feedings to ensure he is receiving sufficient nutrition and that he regularly attends occupational therapy (also known as feeding clinics) to strengthen his swallowing skills. She indicated that K.Z.'s caregivers must have special training regarding the g-tube and the

---

[4]CCDCFS' motion for a second extension of protective supervision as to K.A. was also scheduled to be heard.   However, prior to the hearing, the parties agreed to a second extension of protective supervision.   The juvenile court, therefore, granted the motion and extended protective supervision over K.A. for an additional six months, finding it to be in K.A.'s best interest.

[5]As to when K.Z. was first seen at the aerodigestive clinic, Conard and B.U. provide differing testimony. Although Conard testified the first clinic was held on August 28, 2017, the foster mother testified K.Z. attended his first clinic on April 28, 2017.

procedures to follow if the g-tube comes out, training regarding how to properly thicken his formula, training to recognize the signs of aspiration and training to work on the skills and techniques identified during the feeding clinics.

{¶24} Conard stated that K.Z.'s foster parents were the only persons, to her knowledge, who had been trained regarding K.Z.'s care. She indicated that K.Z.'s foster mother received g-tube training when K.Z. was in the hospital and that his foster father received g-tube training through University Hospitals' Family Learning Center. She indicated that K.Z.'s foster parents received additional instruction regarding his care at the feeding clinics and doctor's appointments.

{¶25} Conard stated that anyone can receive g-tube training simply by calling the Family Learning Center and scheduling an appointment. Conard testified that for Mother to become competent to handle all of K.Z.'s daily medical care needs, it would take "[l]ike four months."

{¶26} With respect to K.Z.'s medical appointments, Conard testified that K.Z. had attended five aerodigestive clinics, that he has regular appointments with his gastroenterologist and that he attends feeding clinics two or three times a month. Conard testified that she had never seen Mother at any of the aerodigestive clinics or doctor's appointments but had heard that Mother had attended a feeding clinic.

{¶27} Conard indicated that K.Z. needs to be in a smoke-free and clean environment because his equipment and g-tube site need to stay clean. She indicated that K.Z. could live around a dog or cat but that "you'd just have to keep it nice and clean" — e.g., no exposure to pet hair — to avoid the g-tube site from getting infected.

{¶28} Conard could not estimate how long K.Z. would remain g-tube dependent or would continue to need special formula or thickeners. She stated that K.Z. was "doing much better" because the foster family had "done a fabulous job with him" but that this did not mean he required

less "hands-on" care. She indicated that K.Z. had recently begun showing signs of "dumping," i.e., chronic diarrhea precluding food absorption, and stated that his current prognosis is "uncertain."

{¶29} Weiss, a pediatric medical social worker at the aerodigestive clinic, testified that she assists families who come to the aerodigestive clinic with issues such as transportation, access to insurance, assistance with utilities and assistance in finding affordable housing. With respect to transportation issues, Weiss testified that if a child has Medicaid, family members can generally receive free transportation to doctors' appointments through the child's insurance. She acknowledged, however, that this would not apply to Mother because she was currently a noncustodial parent. For noncustodial parents, Weiss indicated that there are public transportation options and that there might be other available resources she could "look into" if asked.

{¶30} Weiss indicated that Mother had not contacted her to request any type of assistance. Weiss testified that she had never been given Mother's contact information and had no way of reaching out to Mother to see if there was anything with which she could assist Mother. Weiss stated that usually she meets caregivers when they attend an aerodigestive clinic appointment and establishes contact with them at that time. Because Mother had never attended an aerodigestive clinic, Weiss had never met her.

**Testimony by Foster Mother**

{¶31} K.Z.'s foster mother, B.U., also testified. She indicated that K.Z. has been in her care since he was discharged from the hospital in October 2016. She stated that she is the primary caregiver for K.Z. and that she attends all of his medical appointments and takes care of all of his medical needs.

**{¶32}** B.U. indicated that K.Z. left the hospital with an apnea monitor and a heart monitor and that, due to his drug exposure, also had some issues with hypertonia, i.e., his muscles would spasm and stiffen such that it was difficult to hold and console him. B.U. testified that, as K.Z. got older, his medical conditions became more "complex." She testified in detail regarding the many medical conditions for which K.Z. has been treated since birth and the care required to meet his medical needs. She indicated that K.Z.'s current medical conditions include: dysphagia (a swallowing disorder), hypertonia (causing low muscle tone, a loss of balance and lack of coordination), a milk protein allergy, silent aspiration (causing him to be g-tube dependent), acid reflux and dumping syndrome. She indicated that K.Z. has also had some issues with his vision for which he sees an ophthalmologist and has experienced some "seizure-like activities" for which he sees a neurologist.

**{¶33}** B.U. testified K.Z. sees his primary medical team at the aerodigestive clinic, which has included, at various points, a pulmonologist, a pediatric surgeon, a gastroenterologist, an ear-nose-and-throat specialist, a speech therapist, an occupational therapist, a nutritionist and a social worker. B.U. testified that, at the recommendation of the aerodigestive clinic team, in July 2017, a g-tube was inserted in K.Z.'s abdomen and a Nissen was performed. At that time, K.Z. had not been gaining enough weight, was silently aspirating and was having issues with severe acid reflux.

**{¶34}** B.U. stated that K.Z. was hospitalized for five days following these procedures. She testified that she remained at the hospital with K.Z. "[t]he whole time" and that Mother was present for the pre-op, stayed for "[m]aybe an hour" and then left to run an errand. B.U. stated that when Mother returned, K.Z. was in recovery and Mother fell asleep while standing next to his bedside.

**{¶35}** B.U. testified that to learn how to properly care for K.Z.'s g-tube and to administer overnight feeds, she and K.Z.'s foster father received training from the Family Learning Center

and that she also received "bedside training" from the nurses at the hospital. B.U. indicated that, to her knowledge, Mother has not received this training.

{¶36} B.U. stated that for his dysphagia, K.Z. drinks thickened formula, attends a feeding clinic twice a month and works with an occupational therapist on various food and drink challenges, trying different types and textures of foods, bottles and formulas. As treatment for his hypertonia, K.Z. receives physical therapy and occupational therapy once a week and B.U. does recommended exercises and therapy with him at home.

{¶37} B.U. testified that K.Z.'s care is "pretty much * * * 24/7 a day" but that she and K.Z.'s foster father have it "pretty much down to a science now" and that "[i]t's a routine." As she described his daily care regimen:

> I mean, we're always doing his physical and occupational therapy. We're always kind of moving him. You know, in the morning we're giving him his meds. He has to have 300 milligrams — I'm sorry, ml's of free water during the day because we can't — it's not like we can take a glass of water when we want to get a drink of water. * * * So he has an extension attached to his G-tube, so we have to make sure he gets that, so we always have to make sure he's getting that. So throughout the day, he gets his meds in the morning. Then periodic diaper changes. Then Monday it's his appointments, because he has physical therapy, and we're working through his own therapy during the day, too. And then meds. He gets gas drops as needed throughout the day, and then his occupational therapy when we're playing with him or when he's playing with his foster siblings. And then his feeds during the night. And then if we feed the bed, because that usually happens because it's user error, or he kicks open the med port, then we usually end up having to give him a bath in the middle of the night. So it's constant all the time it seems. Some days it is, and sometimes it's not.

{¶38} B.U. testified that K.Z. also sees an ophthalmologist every three or four months and a neurologist every six months. B.U. testified that K.Z.'s appointments are typically scheduled months in advance. Although she did not communicate with Mother "early on," B.U. stated that she now has regular contact with Mother and gives Mother a printout of K.Z.'s scheduled

appointments at Mother's weekly visits with K.Z. B.U. stated that she does not ask for Mother's input regarding when to schedule K.Z.'s medical appointments.

{¶39} B.U. estimated that K.Z. has had approximately 30-35 physical therapy appointments, 31-33 occupational therapy appointments, 19-20 feeding clinic appointments, six ophthalmology appointments and three neurology appointments. According to B.U., Mother has attended two feeding clinics, one ophthalmology appointment and one neurology appointment. With respect to Mother's attendance at the feeding clinic appointments, B.U. indicated that "[t]here wasn't much interaction" with Mother and that Mother fell asleep during one of the appointments.

{¶40} B.U. testified that K.Z. has a significant bond with her children, that they love him and he is "best friends" with one of their other foster daughters.

### Testimony by CCDCFS Caseworker

{¶41} Whatley has been the caseworker assigned to K.Z.'s case since he was born. Whatley testified that Mother currently lives with family friends in a three-bedroom house with a number of pets — seven cats, two dogs and a turtle — a strong animal odor and lots of cat hair. Whatley stated that although the home is appropriate for K.A., it is not appropriate for K.Z., who, due to his medical issues, requires a "clean" living environment. Whatley testified that Mother has "no basic needs" for K.Z. in the home, e.g., no bed or clothing for K.Z. Although Mother and K.A. each have their own bedroom, Whatley indicated that the way K.A.'s room was set up, there was no room for a bed for K.Z.

{¶42} With respect to the referrals made for Mother, Whatley testified that when her case was first opened, the agency referred Mother for services at her local community collaborative. She indicated that Mother had used those services to get items for K.Z. Whatley stated that she offered to refer Mother to the Cuyahoga Metropolitan Housing Authority ("CMHA") for housing,

but that Mother refused the referral, stating that she "didn't want to live in the hood." Whatley testified that Mother did not qualify for the only other housing referral program she had available, which was available only "when you're about to reunify the child, and the last thing they need to accomplish on the case plan is just that housing" because Mother was not in a position to be reunified with K.Z.

{¶43} Whatley testified that Mother is not employed and has no income and that she encouraged Mother get a job so that she could secure and maintain independent housing and support her children. Whatley stated that Mother told her in October 2017 that she was looking for work and that one of her roommates had agreed to care for K.Z. while she worked. Whatley indicated that Mother's roommate had attended several of K.Z.'s appointments with Mother but had not had any medical training related to K.Z.'s care.

{¶44} Whatley stated that when she raised the issues of employment and housing with Mother again on April 10, 2018 — two weeks before the hearing — Mother said that she "was waiting to see what would happen with [K.Z.]" and that she did not know if she could get a job because she did not know whether K.Z. would require 24-hour care. With respect to housing, Mother informed Whatley that a friend had agreed to pay her rent for four months so she could find a new place to live. Whatley stated that she explained to Mother that to meet the housing objective of her case plan, she not only had to find appropriate housing for K.Z. but had to show she could maintain it and pay rent, utilities and other expenses. Whatley stated that she encouraged Mother to keep looking for her own housing.

{¶45} With respect to mental health issues, Whatley stated that when she initially received the case, Mother self-reported that she had been diagnosed with anxiety and depression. She indicated that Mother completed a mental health assessment at the Hitchcock Center for Women

and was again diagnosed with anxiety and depression. Whatley indicated that although Mother was, at one point, receiving mental health services, she was not, to her knowledge, still receiving any mental health services at the time of the hearing. She stated that Mother had informed her that she felt like she no longer needed to address the anxiety and depression because it was tied closely to her substance abuse use, and she was no longer using any illegal substances.

{¶46} In February 2017, the agency stated that Mother appeared to be "well bonded" to her children. With respect to visitation, Whatley testified that Mother regularly attends weekly visits with K.Z. at a local library and often brings K.A. with her. With respect to the quality of her interaction with K.Z., Whatley testified that Mother "does have some good visits," but that since June 2017, "her drowsiness [has] gotten worse." She testified that "[m]ost visits, she's sleeping," that on some visits she "has to constantly be redirected" and that Mother sometimes struggles with supervising both K.A. and K.Z. Whatley indicated that Mother comes to the visits late, is "sometimes disheveled" and "often confused" and that she, at times, "notice[s] bruises and things on her." Whatley indicated that, at a recent visit, Mother was repeatedly falling asleep. She stated that she would not have let K.A. go home with her except that one of Mother's roommates came to pick them up. Whatley indicated that Mother's roommates are "always appropriate" with K.A.

{¶47} Whatley indicated that Mother also failed to meet the objectives of her case plan with respect to K.Z.'s medical needs. She indicated that K.Z. has had 152 medical appointments since he was born and that although Mother receives printouts from the foster mother with listings of K.Z.'s appointments, Mother had only attended 10 of those appointments and had not competed g-tube training. Whatley indicated that, when she asked Mother why she has not attended K.Z.'s appointments, Mother responds that it is because she does not have transportation to the

appointments. Whatley stated that she told Mother that, as a parent, it is her responsibility to make it to K.Z.'s medical appointments and her responsibility to "figure out" a way to get there via "public buses, taxis, Ubers, whatever."

{¶48} With respect to K.Z.'s alleged father, Whatley testified that she knows nothing about him and that, based on the searches she has performed, the only address that comes up for him is the address where Mother resides. Whatley stated that Mother informed her that she does not have contact information for the alleged father and does not know his current whereabouts. Whatley testified that he does not visit K.Z. and has not attended any of his medical appointments.

{¶49} Whatley stated that although she has observed the foster mother give Mother copies of K.Z.'s medical diagnoses and update Mother regarding what is going on with K.Z., Mother is "not knowledgeable" regarding K.Z.'s care and conditions, rarely asks questions, is "not engaged" and falls asleep during his appointments.

{¶50} When asked why the agency was requesting permanent custody of K.Z. rather than an extension of temporary custody, Whatley replied that it was because (1) K.Z. is a "medically fragile" child, who "requires special care that you have to be trained on" and (2) Mother does not know or understand K.Z.'s medical diagnoses, has failed to attend his appointments and has failed to get involved in his treatment.

{¶51} On cross-examination, Whatley acknowledged that Mother had made significant progress on certain aspects of her case plan, including completing a parenting class, successfully completing an inpatient drug treatment program and demonstrating a commitment to maintaining sobriety.

{¶52} Whatley also acknowledged that Mother had contacted Whatley and told her she was having difficulty scheduling an appointment to get the g-tube training she needed to care for K.Z.

Whatley stated that Mother claimed that when she contacted the Family Learning Center to schedule an appointment, she was told that the agency needed to set up the appointment for her. Whatley testified that she told Mother that she could not set up an appointment for her because she did not know Mother's schedule. Whatley stated that she did not call the Family Learning Center to follow up on the issue because what Mother said did not "make sense" and because Whatley had previously spoken with a social worker and doctor at the aerodigestive clinic regarding what needed to be done for Mother to schedule an appointment for g-tube training at the Family Learning Center.

{¶53} Whatley stated that after the agency filed for permanent custody, she did not make any further referrals to assist Mother with housing, job training or any other aspect of her case plan but continued to encourage Mother to attend K.Z.'s medical appointments.

{¶54} Noting that multiple witnesses had raised concerns regarding Mother falling asleep, the juvenile court judge asked Whatley about this. Whatley stated that the agency has no idea why Mother keeps falling sleep. She testified that she raised the issue with Mother "every time [she] observed it" and encouraged Mother to see a doctor. Whatley testified that Mother once reported that she had had a seizure and that she was told she might have narcolepsy but later informed Whatley that she was told she was not narcoleptic.

**Evidence Introduced by Mother**

{¶55} Mother called no witnesses but submitted documentation demonstrating her completion of a parenting class in March 2017, her completion of a residential drug treatment program at the Hitchcock Center for Women in October 2017, her attendance at more than 70 12-step meetings from March 2017 to January 2018 and CCDCFS' case plan, activity logs and report of its semiannual review.

**The Guardian ad Litem's Recommendation**

**{¶56}** K.Z.'s guardian ad litem also testified at the hearing. He indicated that he did not update his March 6, 2018 report prior to the hearing because "there was no Court order [or] oral or written request from any party for me to file an updated report." He stated that he could "elaborate some" on his final report based on the evidence presented at the hearing but indicated that the "body of his recommendation had not changed" from that stated in his report.

**{¶57}** The guardian ad litem testified that he "interviewed" Mother and the foster parents "a number of times" and interacted with the CCDCFS social worker "countless times" during his investigation. He indicated that he did not interview K.Z.'s alleged father because no contact information had been provided for him. He indicated that he also received medical records relating to K.Z. from the foster parents.

**{¶58}** The guardian ad litem stated that he was unable to visit Mother's home until March 22, 2018 but had "interviewed" Mother when he saw her "[a]t pretrials, at [c]ourt appearances, what have you." He indicated that when he was able to speak with Mother, she was "pleasant and forthcoming" but that frequently she was "out of it," "asleep in the hallway" at the courthouse. Although he had once viewed Mother's interactions with K.A., he stated that he had never viewed any parent-to-child interactions between Mother and K.Z.

**{¶59}** He stated that when he arrived at Mother's home on March 22, 2018, Mother greeted him. Although Mother indicated that she thought the visit had been scheduled for another day, she let him in. The guardian ad litem indicated that he stayed for approximately 30 minutes and, during that time, observed K.A., mother's roommates and the home. He indicated that the home is cluttered but "fairly appropriate" and the "main issue" he had with the home was the "intense odor * * * of animal urine," which he presumed was in the carpet. He indicated that based on the

medical information he had received, he did not believe the animal odor was "safe or healthy" or that Mother's home was appropriate for K.Z. Although he had been informed that Mother was attempting to locate another residence, he testified that he had "been hearing that for quite awhile during the pendency of this case." He indicated that he did not see a crib or other provisions for an infant in the home. Based on K.Z.'s medical conditions and Mother's "inability to provide care at this time," he recommended that the agency be granted permanent custody.

{¶60} Mother moved to strike the guardian ad litem's report for failure to comply with Juv.Loc.R. 18 and the Rules of Superintendence.

**The Juvenile Court's Rulings**

{¶61} On May 21, 2018, the juvenile court (1) granted the agency's motion for permanent custody, terminating the parental rights of Mother and K.Z.'s alleged father and awarding permanent custody of K.Z. to CCDCFS and (2) denied Mother's motion to strike the guardian ad litem's report and Mother's motions to extend temporary custody or, in the alternative, for legal custody.

{¶62} The juvenile court found, by clear and convincing evidence, that K.Z. "cannot and should not be reunified with [his] parents" and that it was in K.Z.'s best interest to grant permanent custody to the agency. The court also found that CCDCFS had made reasonable efforts to make it possible for the child to remain in or return to the home and to finalize the permanency plan for K.Z.

{¶63} Mother appealed, raising the following three assignments of error for review:

Assignment of Error I: The trial court abused its discretion by denying Appellant's motion for a second extension of temporary custody.

Assignment of Error II: The trial court committed prejudicial error by refusing to strike the guardian ad litem's report and recommendation where the evidence

demonstrated that his investigation failed to meet the basis requirements of Loc.R. 18 and Rule 48 of the Rules of Superintendence.

Assignment of Error III: The termination of Appellant's parental rights and the award of permanent custody is against the manifest weight of the evidence.

**Law and Analysis**

{¶64} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶65} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative [of] last resort," *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise,* 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable

life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

**Motion to Strike Guardian ad Litem's Report and Recommendation**

**{¶66}** For ease of discussion, we address Mother's second assignment of error first. In her second assignment of error, Mother argues that the juvenile court erred in refusing to strike the guardian ad litem's report and recommendation because he did not comply with Sup.R. 48(D) and Juv.Loc.R. 18(G). Mother contends that the guardian ad litem's investigation and report failed to meet "the minimum standards established by the rules of court" in the following respects: (1) the guardian ad litem failed to visit Mother's home until one and one-half years after his appointment; (2) the guardian ad litem never observed Mother interacting with K.Z.; (3) the guardian ad litem kept no record of when he interviewed persons he claimed to have interviewed; (4) the guardian ad litem did not meet with K.Z.'s medical providers; (5) instead of conducting an independent investigation he relied on information provided by the CCDCFS caseworker and (6) the guardian ad litem made no effort to interview the alleged father of K.Z. *See* Sup.R. 48(D)(13)(a), (d), (g) and 16; Juv.Loc.R. 18(G)(3).

**{¶67}** The role of a guardian ad litem in a permanent custody proceeding is to protect the child's interest, to ensure that the child's interests are represented throughout the proceedings and to assist the trial court in its determination of what is in the child's best interest. *See, e.g., In re C.B.*, 129 Ohio St.3d 231, 2011-Ohio-2899, 951 N.E.2d 398, ¶ 14, citing R.C. 2151.281(B) and Sup.R. 48(B)(1). This is accomplished by the guardian ad litem conducting an investigation of the child's situation and then making recommendations to the court as to what the guardian ad

litem believes would be in the child's best interest. *In re J.C.*, 4th Dist. Adams No. 07CA833, 2007-Ohio-3781, ¶ 13.

**{¶68}** R.C. 2151.281, Sup.R. 48 and Juv.Loc.R. 15, 17 and 18 address the role and responsibilities of a guardian ad litem. R.C. 2151.281(I) provides that a guardian ad litem

> shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court.

**{¶69}** Sup.R. 48(D) provides, in relevant part:

> In order to provide the court with relevant information and an informed recommendation regarding the child's best interest, a guardian ad litem shall perform, at a minimum, the responsibilities stated in this division, unless impracticable or inadvisable to do so.
> (13) A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:
>
> > (a) Meet with and interview the child and observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present;
> >
> > (b) Visit the child at his or her residence in accordance with any standards established by the court in which the guardian ad litem is appointed;
> >
> > (c) Ascertain the wishes of the child;
> >
> > (d) Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;
> >
> > (e) Review pleadings and other relevant court documents in the case in which the guardian ad litem is appointed;

(f) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case;

(g) Interview school personnel, medical and mental health providers, child protective services workers and relevant court personnel and obtain copies of relevant records;

(h) Recommend that the court order psychological evaluations, mental health and/or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court; and

(i) Perform any other investigation necessary to make an informed recommendation regarding the best interest of the child.

\* \* \*

(16) A guardian ad litem shall perform responsibilities in a prompt and timely manner \* \* \* [.]

{¶70} Sup.R. 48(F) further provides:

A guardian ad litem shall prepare a written final report, including recommendations to the court, within the times set forth in this division. The report shall detail the activities performed, hearings attended, persons interviewed, documents reviewed, experts consulted and all other relevant information considered by the guardian ad litem in reaching the guardian ad litem's recommendations and in accomplishing the duties required by statute, by court rule, and in the court's Order of Appointment.

{¶71} Juv.Loc.R. 18(G) also addresses the content of the guardian ad litem's report. It states:

Each Guardian ad Litem Report shall detail the following when disclosure is in the best interests of the child:

(1) Activities performed;

(2) Hearings attended;

(3) Persons interviewed and dates of the interviews;

(4) Documents reviewed;

(5) Experts consulted;

(6) Summary of the child's case;

(7) Any special needs of the child (e.g., mental health, disabilities, etc.);

(8) That the Guardian ad litem ascertained the child's wishes or that the child lacked sufficient maturity to express his or her wishes;

(9) Dispositional and placement options (e.g., relatives, third parties, private placement, etc.)[;]

(10) Specific recommendations, including recommendations of disposition, and the Guardian ad litem's reasons for that position;

(11) All other recommendations, suggestions or concerns that the Guardian ad litem can identify as in the child's best interests;

(12) All other relevant information considered by the Guardian ad litem in reaching the Guardian ad litem's recommendations and in accomplishing the duties required by statute, by court rule, and in the court's Order of Appointment.

**{¶72}** As this court and others have recognized, "'Sup.R. 48 provides * * * good guidelines for the conduct of a guardian ad litem in meeting his or her responsibilities in representing the best interest of a child in order to provide the court with relevant information and an informed recommendation.'" *In re C.O.*, 8th Dist. Cuyahoga Nos. 99334 and 99335, 2013-Ohio-5239, ¶ 14, quoting *In re K.G.,* 9th Dist. Wayne No. 10CA16, 2010-Ohio-4399, ¶ 12. However, the Rules of Superintendence are only "'general guidelines for the conduct of the courts'" and "'do not create substantive rights in individuals or procedural law.'" *In re C.O.* at ¶ 14, quoting *In re K.G.* at ¶ 11. As such, it has been generally held that a guardian ad litem's

failure to comply with Sup.R. 48 is not, in and of itself, grounds for reversal of a custody determination. *See, e.g., In re C.O.* at ¶ 14;

*In re N.B.*, 8th Dist. Cuyahoga No. 105028, 2017-Ohio-1376, ¶ 26; *Miller v. Miller*, 4th Dist. Athens No. 14CA6, 2014-Ohio-5127, ¶ 14-18.

{¶73} Likewise, courts are "given latitude" in following their own local rules. As such, enforcement of such rules is generally within the sound discretion of the court. *Citibank, N.A. v. Katz*, 8th Dist. Cuyahoga No. 98753, 2013-Ohio-1041, ¶ 29. "So long as a trial court's failure to comply with or enforce its local rules does not affect due process or other constitutional rights, 'there is no error when, in its sound discretion, the court decides that the peculiar circumstances of a case require deviation from its own rules.'" *Id.*, quoting *Dodson v. Maines*, 6th Dist. Sandusky No. S-11-012, 2012-Ohio-2548, ¶ 47.

{¶74} In this case, we cannot fault the guardian ad litem for not interviewing the alleged father. The alleged father had no involvement with K.Z. and there is no indication that anyone had any contact information for him. Likewise, although the guardian ad litem did not include all the specific dates he performed various tasks in his report and could not testify regarding specific dates at the hearing, he submitted three reports — dated January 13, 2017, October 19, 2017 and March 6, 2018 — summarizing his investigation at various stages of the proceeding and "elaborated" on his March 6, 2018 report and recommendation during his testimony at the hearing. *See* Sup.R. 48(F)(1)(d) ("A guardian ad litem shall be available to testify at the dispositional hearing and may orally supplement the final report at the conclusion of the hearing."); Juv.Loc.R. 18(H) (guardian ad litem "may orally supplement the final report at the conclusion of the hearing").

{¶75} Although there is nothing in the record to indicate that the guardian ad litem personally contacted any of K.Z.'s medical providers, he testified that he had reviewed detailed medical records he received from the foster parents relating to K.Z. Furthermore, there does not appear to be any dispute in this case regarding K.Z.'s medical conditions and the care required to meet his medical needs.

**{¶76}** There are, however, other potential deficiencies with the guardian ad litem's investigation that give us pause. For example, although it appears Mother has lived at the same location for the duration of this case, the guardian ad litem did not conduct a home visit of Mother's residence until March 22, 2018 — nearly a year and a half after K.Z. was placed in custody. Likewise, although the guardian ad litem testified that he had "interviewed" Mother "a number of times," upon further questioning, he revealed that, until his home visit on March 22, 2018, those "interviews" consisted of interacting with Mother in the hallways of the courthouse when she attended pretrial conferences or other court proceedings. Further, although Mother had regular, weekly visits with K.Z., the guardian ad litem never viewed Mother's interactions with K.Z. and offered no explanation as to why he failed to do so.

**{¶77}** In his final report dated March 6, 2018, the guardian ad litem set forth his recommendation that it would be in the best interest of K.Z. to grant CCDCFS' motion to modify temporary custody to permanent custody. The guardian ad litem, therefore, made this recommendation without conducting a full interview of Mother, before he visited her residence and without ever personally viewing Mother's interaction with K.Z. This could call into question the thoroughness of the guardian ad litem's investigation and the reliability of his recommendation.

**{¶78}** Although the guardian ad litem's report and investigation may not have been as detailed or as thorough as one might like, Mother's counsel had the opportunity to cross-examine the guardian ad litem and to highlight the deficiencies in his investigation and report through that examination. Furthermore, the guardian ad litem's report and recommendation was just one of the factors the juvenile court considered in determining whether granting permanent custody to CCDCFS was in the best interest of K.Z. Although a trial court is generally obliged to consider the recommendation of a child's guardian ad litem, it is "not bound to adopt" it. *In re J.B.*, 8th

Dist. Cuyahoga Nos. 98566 and 98567, 2013-Ohio-1706, ¶ 152. The "ultimate decision" is for the trial judge who "must act upon a consideration of all evidence presented." *Id.*, citing *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 34. Based on the record before us, we cannot say that the juvenile court abused its discretion in denying Mother's motion to strike the guardian ad litem's report and recommendation. Accordingly, Mother's second assignment of error is overruled.

### The Juvenile Court's Decision to Grant Permanent Custody of K.Z. to CCDCFS

**{¶79}** Mother's first and third assignments of error are interrelated and will be addressed together. In her first assignment of error, Mother argues that the trial court abused its discretion in denying her motion for a six-month extension of temporary custody. In her third assignment of error, Mother challenges the juvenile court's finding that granting permanent custody to CCDCFS is in the best interest of K.Z. and contends that it is against the manifest weight of the evidence.

### Standard for Extending a Temporary Custody Order

**{¶80}** Under R.C. 2151.415(D)(1), the court may extend a temporary custody order for up to six months, if it finds, by clear and convincing evidence, that the extension is in the best interest of the child, that there has been significant progress on the case plan, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension.[6] We review a juvenile court's decision on a motion to extend a temporary custody order for abuse of discretion. *See, e.g., In re Da.B.*, 8th Dist. Cuyahoga No.

---

[6]Because more than six months elapsed between the time CCDCFS filed its motion for permanent custody and the hearing on the motion, CCDCFS argues that Mother's motion should have been considered a motion for a second extension of temporary custody under R.C. 2151.415(D)(2) rather than a motion for a first extension of temporary custody under R.C. 2151.415(D)(1). However, regardless of whether Mother's motion is considered a motion for a first or second extension of temporary custody, it would not change the result here.

105886, 2018-Ohio-689, ¶ 18.  A court abuses its discretion where the court's decision is unreasonable, arbitrary or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### Standard for Terminating Parental Rights and Granting Permanent Custody to CCDCFS

{¶81} Before a juvenile court can terminate parental rights and grant permanent custody of a child to CCDCFS, it must satisfy the two-prong test set forth in R.C. 2151.414.  First, the juvenile court must find by clear and convincing evidence that one of the following conditions set forth in R.C. 2151.414(B)(1)(a) through (e) exists:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

> (b) The child is abandoned.

> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

> (e)  The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶82}** Second, the juvenile court must find by clear and convincing evidence that granting permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1). "Clear and convincing evidence" is that measure or degree of proof that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 2015-Ohio-1028, at ¶ 8. A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence." *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

**{¶83}** On appeal, Mother does not dispute that CCDCFS established the first prong of the two-part test for granting its motion for permanent custody, i.e., that one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) exists.[7] She challenges only the juvenile court's finding that an award of permanent custody is in the best interest of K.Z.

**{¶84}** Accordingly, we must consider whether clear and convincing evidence supports the juvenile court's finding that it was in K.Z.'s best interest to award permanent custody to CCDCFS and whether the juvenile court abused its discretion in denying Mother's motion to extend temporary custody.

**{¶85}** The best interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, at ¶ 59. In determining whether permanent custody is in the best interest of the child, the juvenile court consider must consider "all relevant factors," including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

---

[7] In this case, the agency filed its motion for permanent custody under R.C. 2151.414(B)(1)(a).

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in [R.C. 2151.414 (E)(7) to (11)] apply in relation to the parents and child.

R.C. 2151.414(D)(1).

**{¶86}** The juvenile court has considerable discretion in weighing these factors. We review a juvenile court's determination of a child's best interest for abuse of that discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47; *see also In re J.B.*, 2013-Ohio-1704, at ¶ 97 ("[T]he discretion that a trial court has in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned."). Although the juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1), no one factor is to be given greater weight than the others. *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Further, only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of permanent custody. *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In re N.B.* at ¶ 53.

**{¶87}** In its May 21, 2018 journal entry awarding permanent custody to CCDCFS, the juvenile court identified each of the relevant factors it considered under R.C. 2151.414 in determining that an award of permanent custody to the agency was in the best interest of K.Z. The juvenile court explained its evaluation of these factors as follows:

The child cannot and should not be reunified with the child's parents as discussed below. * * *

The primary issue in this case is the mother's ability to meet this child's extensive special and medical needs. There was ample, undisputed testimony about the child's extensive medical problems and care needs. The child is receiving what is

essentially round the clock care from the foster mother. The case plan for the mother required her to find appropriate housing, to be able to meet the child's basic needs, and to be able to meet the child's special needs. The Court finds that CCDCFS has presented clear and convincing evidence that it is not in the child's best interest to be reunified with his mother, and that his father has abandoned him.[8]

Counsel for the mother is requesting an extension of temporary custody. However, based on the history of this case as presented in the evidence, there has not been significant progress on the case plan, and there is not reasonable cause to believe that the [child] will be reunified with the mother or otherwise permanently placed within the period of extension. See R.C. 2151.415(D)(1).

The mother is currently living with friends. There are four people in the home, and three bedrooms. There are no provisions in the home for a baby. The mother currently has no income and is not employed. The child has had 152 medical appointments since he's been in the custody of CCDCFS. The mother has attended 10 of those appointments. This child has had a G-Tube since June or July of 2017, and his caretaker must be trained in how to manage the care of the G-Tube. In nearly a year, the mother has yet to attend training on how to manage this G-Tube. The testimony and evidence was that the mother sleeps during visits with the child. The GAL wrote in his report that the mother appears to be "out of it" and that was the observation of the Court during the trial.

This case is not about the foster parents versus the biological mother. See R.C. 2151.414(C). It is simply and only about the mother's ability to safely provide for this child's extreme medical needs. The Court finds that the child cannot be reunified with the parents, and that an extension of temporary custody is not in the child's best interest, that there has not been significant progress on

---

[8] There is no dispute that K.Z.'s alleged father abandoned K.Z.

the case plan, and that there is not reasonable cause to believe that the child will be reunified within the extension. See R.C. 2151.415(D)(1).

**{¶88}** Competent, credible, clear and convincing evidence supports the juvenile court's findings. Although Mother made substantial progress on the elements of her case plan related to her drug abuse, the evidence reflects that she did virtually nothing to address other aspects of her case plan. In particular, she made no significant progress towards meeting K.Z.'s basic needs. She made no meaningful progress toward securing and maintaining appropriate housing for K.Z. or being able to meet K.Z.'s medical needs, including attending K.Z.'s medical appointments, becoming knowledgeable about his medical conditions and becoming actively involved in his medical care and treatment.

**{¶89}** Although Mother may have had difficulty attending appointments while she was in drug treatment, the record reflects that she completed drug treatment in early October 2017. Further, although the record reflects that Mother attended numerous 12-step meetings while she was in drug treatment, i.e., from March to May 2017 and from August to October 2017, outside of that time period, she attended only two 12-step meetings — one in November 2017 and one in January 2018. However, Mother's attendance at K.Z.'s doctor's appointments did not increase significantly after she completed drug treatment. As of the date of the hearing, it was undisputed that Mother had attended only 10 out of 152 of K.Z.'s medical appointments. Mother was not working and K.A. was in school during the day. It was undisputed that Mother received the schedule of K.Z.'s medical appointments months in advance. These appointments were critical

to K.Z.'s growth, development and safety and, given his "uncertain" prognosis, would likely continue for quite some time in the future. Mother failed to show that if she were to be reunited with K.Z., she would be able to sufficiently manage her own schedule and K.A.'s schedule and make the other arrangements necessary to transport K.Z. to his medical appointments.

{¶90} A critical component of K.Z.'s care involved the handling of his g-tube, which was inserted in July 2017. Although Mother needed only to make an appointment at the Family Learning Center to obtain the training she needed to care for K.Z.'s g-tube, it was undisputed that, by April 2018, Mother still had not even made an appointment for g-tube training. Nor did Mother take any steps to become knowledgeable regarding the other aspects of K.Z.'s care, including how to properly thicken his formula, how to recognize the signs of aspiration, how to work on the skills and techniques identified during the feeding clinics or how to perform the physical therapy exercises K.Z. needed to do on a daily basis. Although Conard, the nurse practitioner from the aerodigestive clinic, testified that Mother could become competent to handle K.Z.'s medical needs in approximately four months, Mother showed no interest in initiating that process. The record reflects that Mother knew little about K.Z.'s medical conditions, did not engage with K.Z.'s medical providers or the foster mother regarding his treatment and showed no interest in becoming more knowledgeable about his medical conditions or medical needs.

{¶91} Likewise, the record reflects that Mother made no effort to find a job to support K.Z. and K.A. and took no meaningful steps to secure appropriate housing for K.Z. Although CCDCFS offered her housing referral to CMHA to obtain appropriate housing, Mother refused it.

{¶92} In addition to Mother's lack of attention to K.Z.'s medical needs and transportation and housing issues, multiple witnesses commented on the tendency of Mother to fall asleep. This was not simply an issue of Mother being tired and sleeping during visits with K.Z. The record

reflects that Mother was falling asleep under circumstances and in situations where one would not expect a person to fall asleep, e.g., while standing holding a baby, while sitting on a ledge or at a computer, while sitting in a courtroom hallway awaiting a pretrial conference — calling into question her ability to properly care for and supervise K.Z. As the guardian ad litem described it in his closing argument: "[M]other falls asleep all the time. It's the mystery of the case. I would love to have the answer. None of us do, though." The agency's concern regarding Mother's habit of falling asleep while caring for K.Z. dates back to the complaint CCDCFS filed in October 2016. Although Whatley, the agency's social worker, testified that she raised the issue with Mother each time she observed it, there is no indication in the record that Mother sought medical treatment for, or was otherwise taking the steps necessary to determine the cause of, and to resolve, this problem.

{¶93} Every parental rights termination case involves the difficult balance between maintaining a natural parent-child relationship and protecting the best interests of a child. Although "[f]amily unity and blood relationship are vital factors to carefully and fully consider," we also recognize that the "paramount consideration" is always the best interest of the child. *In re J.B.*, 2013-Ohio-1704, at ¶ 111. "[A] child's best interests require permanency and a safe and secure environment." *In re E.W.*, 8th Dist. Cuyahoga Nos. 100473 and 100474, 2014-Ohio-2534, ¶ 29.

{¶94} K.Z. has been in the temporary custody of CCDCFS since birth. He has never lived with his Mother. Mother is not at a place where she could be reunited with K.Z. and there is nothing in the record that would give the court reasonable cause to believe that K.Z. could be reunified with Mother in six months or any other reasonable time. Indeed, although the evidentiary hearing on the agency's motion to modify temporary custody to permanent custody

was held more than six months after CCDCFS filed the motion, Mother made little, if any progress, towards meeting K.Z.'s basic needs during that time period.

{¶95} On the record before us, we cannot say that the juvenile court abused its discretion in determining that an award of permanent custody to CCDCFS was in K.Z.'s best interest and in denying Mother's motion to extend temporary custody. Accordingly, we overrule Mother's first and third assignments of error.

{¶96} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
LARRY A. JONES, SR., J., CONCUR