[Cite as *In re M.J.*, 2022-Ohio-4090.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE M.J., ET AL.                          :

                                            :                No. 111708
A Minor Child

                                            :
[Appeal by J.P., Mother]                    :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 17, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD20900639, 209000640, and 20900641

---

### *Appearances:*

Michael E. Stinn, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee*.

CORNELIUS J. O'SULLIVAN, JR., J.:

**{¶ 1}** Appellant mother appeals from a judgment of the juvenile court granting permanent custody of her children, M.J., M.L., and L.L. ("collectively referred to as "the children") to the Cuyahoga County Division of Children and Family Services (hereafter "CCDCFS" or "agency"). Our review reflects the juvenile

court properly engaged in the statutory analysis set forth in R.C. 2151.414 and clear and convincing evidence supports the findings made by the court in support of its decision granting permanent custody. Accordingly, we affirm the juvenile court's decision.

**Substantive History and Procedural Background**

{¶ 2} The oldest of the three children at issue here, M.J., was born in October 2015. The middle child, M.L., was born in September 2016, and the youngest, L.L., was born in January 2018.

{¶ 3} Appellant's history with the agency dates to 2015 when M.J. and two of appellant's other children were adjudicated dependent. The two other siblings were removed from appellant's care, placed in the legal custody of maternal grandmother, and are not at issue in this case. In 2017, appellant was again involved with the agency when M.J. and M.L. were adjudicated dependent.

{¶ 4} Then, on January 16, 2020, CCDCFS filed a complaint alleging M.J., M.L., and L.L. were neglected and dependent and requesting temporary custody. On January 28, 2020, the children were removed from appellant's care. The complaint alleged appellant was homeless, had been asked to leave two homeless shelters, and had untreated mental health issues. The complaint also had allegations as to each child's father or alleged father.[1]

---

[1] M.J.'s father is deceased. M.L.'s father is unknown. L.L.'s father is incarcerated and, according to appellant, wants no involvement with his child. He also did not file a notice of appeal in this case. Therefore, discussion regarding the fathers will be minimal.

{¶ 5} At the emergency custody hearing, appellant appeared with counsel, admitted to an amended complaint, and stipulated to the agency's request for emergency temporary custody. The trial court ordered the children into the pre-dispositional temporary custody of the agency. The agency developed a case plan with a goal for reunification. The objectives on the case plan were mental health, housing, parenting, and anger management.

{¶ 6} The trial court ordered a first extension of temporary custody in March 2021, noting appellant stopped visiting with the children in January 2021. The court further noted that "[a]ttempts to appoint a supportive visitation coach have been made due to ongoing concerns with [appellant]'s parenting. During visits with children, [appellant] does not maintain control of children * * * or appropriately addresses [sic] behaviors." In July 2021, the trial court ordered a second extension of temporary custody, finding that appellant was on the waiting list for supportive visitation, currently had weekly supervised visits with the children, and had not yet found housing.

{¶ 7} On August 24, 2021, CCDCFS filed an emergency case plan amendment to suspend appellant's visitation with the children "due to appellant threatening the children's foster care provider and the CCDCFS caseworker during visits with the children." On September 28, 2021, appellant filed an objection to the case plan amendment, but later withdrew her objection after the parties reached an agreement that appellant would be able to see children weekly at family therapy

sessions and additional visitation would resume upon recommendation of the family therapist.

{¶ 8} On December 13, 2021, CCDCFS moved to modify temporary custody to permanent custody. The motion alleged, in part, that appellant had "failed to benefit from services and remains unable to provide appropriate care for the children."

{¶ 9} The trial court held a full hearing. CCDCFS social worker Donnell Bailey testified that she was the family's ongoing caseworker. Bailey testified that appellant completed anger management classes but was unable to show that she benefitted from the classes because she continued to struggle to control her anger, which led to the suspension of her visits with the children. The caseworker gave the example of one visit where appellant verbally berated M.J. and foster mother to the point where M.J. was traumatized and, for hours after the visit, yelled, screamed, and kicked the walls.

{¶ 10} Bailey testified that appellant has made violent threats towards her and the foster mother, telling them both that she was going to "F" them up. The most recent threat was towards the foster mother and was in the presence of one of the children.

{¶ 11} Mental health was also a component of appellant's case plan. Bailey testified that appellant had a history of untreated bipolar disorder. Appellant received services through Signature Health and was engaged with the service provider, but Bailey had not noticed a substantial change in appellant's behavior

since appellant had engaged in services. Often Bailey found it difficult to engage in conversations with appellant because "one minute she's crying and the second conversation she's laughing * * * it was kinda like all over the place when I was speaking with [her]."

{¶ 12} Bailey testified that appellant had been referred for parenting services because she left the children alone, without supervision. Appellant completed parenting classes and started supportive visits with parent coaches, but those visits ended early due to appellant's "explosive" behavior. The agency tried to work with appellant to restore visitation, but appellant's therapist refused to continue therapy after appellant threatened the therapist. While visits were still active, the foster parents reported that the children would return from visits sick from the junk food appellant fed them.

{¶ 13} Bailey testified that M.J. is placed with maternal grandmother, who also had legal custody of two of appellant's other children. M.J. is doing well in his current placement and is bonded with his caregiver and siblings. His basic needs are being met, and he is receiving services including counseling and an Individualized Education Plan ("IEP"). M.L. and L.L. are placed together in another foster home where they are bonded with their caregiver and other family members and their basic needs are met. M.L. and L.L. are also in counseling.

{¶ 14} Jamie Saunt testified that she is an Early Childhood Mental Health Therapist for Ohio Guidestone. Saunt first met the children in February 2020. L.L. was diagnosed with acute stress disorder; M.J. and M.L. were diagnosed with post-

traumatic stress. According to Saunt, all three children had made improvements, but had various setbacks. Saunt testified that M.J. felt he had to take care of his younger siblings when appellant left them unsupervised; M.J. told Saunt he had to make sure his baby sister had a bottle. Saunt worked with M.L. on the domestic violence the child had witnessed "around daddy hitting mommy and daddy going to jail." Saunt testified that the three children exhibited sexualized behavior, but it was unclear if the behavior was a result of sexual abuse or if it was a result of the children witnessing adults engaging in sexual activity.

{¶ 15} Saunt tried to involve appellant in the children's therapy but ultimately had to terminate her involvement because appellant refused coaching and her input and yelled at the therapist in front of the children. After the last session, appellant sent Saunt 35 text messages that were "random ranting." It was at this time that Saunt discontinued therapy sessions that included appellant.

{¶ 16} Nuta Ngangana, appellant's Signature Health counselor, testified that appellant had made improvements in her mental health. According to Ngangana, she attempted to contact Saunt to discuss her concerns with how Saunt was approaching family therapy, i.e., discussing the "alleged" trauma the kids endured rather than focusing on "more positive things." Ngangana also shared appellant's concern that M.J. was placed with maternal grandmother who, according to appellant, had a history of abusing appellant. Ngangana testified that appellant has bipolar effective disorder, post-traumatic stress, and is on the autism spectrum.

{¶ 17} Melanie Buck, appellant's Signature Health case manager, testified that she had been working with appellant to secure housing since September 2021. Buck testified that she initially found it challenging to keep appellant on task and appellant was frustrated, but now "she's easily redirected." Buck testified she has noticed an improvement since appellant started working with Ngangana.

{¶ 18} Guardian ad litem ("GAL") Wildon Ellison testified that appellant was unable to show she had benefitted from parenting classes because, although she had two parenting coaches, she could not successfully complete the parenting program due to her behavior. Ellison testified that appellant had recently secured appropriate housing but had previously been in two shelters and evicted from housing several times. According to the GAL, appellant told him she was out of her medication and, at his last home visit, he saw an empty bottle of vodka near the sink.[2] The GAL spoke with appellant's brother, who had an altercation with appellant during which the police were called. According to the brother, appellant was not compliant with her medication. Finally, the GAL testified that the children have mental health issues, but school is going well, and they are all doing well in their placements.

{¶ 19} The GAL recommended that the children be placed into the permanent custody of the agency. In a June 2, 2022 journal entry, the court granted the agency's motion for permanent custody. Appellant filed the instant appeal.

---

[2] On cross-examination, the GAL conceded that appellant later texted the GAL a picture of her medication refill and, as to the bottle of vodka, appellant denied it was hers and treatment for substance abuse was not a part of her case plan.

**{¶ 20}** On appeal, appellant raises the following two assignments for our review, they will be discussed together because they are interrelated:

> I. The trial court abused its discretion in determining that permanent custody was in the best interest of the children. Therefore, the trial court's order granting permanent custody to CCDCFS should be reversed.
>
> II. The trial court's findings are against the manifest weight of the evidence. Therefore, the trial court's order granting permanent custody to CCDCFS should be reversed.

**Standard of Review and Permanent Custody Statute**

**{¶ 21}** The juvenile court has exclusive jurisdiction to determine the custody of any child not a ward of another court of this state. R.C. 2151.23(A)(2). "It is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), citing *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). Thus, "the overriding principle in custody cases between a parent and nonparent is that [biological] parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16, citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "This interest is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution." *In re Hockstok* at *id.*, citing *Santosky* at *id.*, and *In re Shaeffer Children*, 85 Ohio App.3d 683, 689-690, 621 N.E.2d 426 (3d Dist.1993). A parent's interest, however, is "'always subject to the ultimate welfare of the child.'" *In re M.J.M.*, 8th Dist.

Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 15, quoting *In re B.L.*, 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, ¶ 7.

{¶ 22} Under the second assignment of error, appellant claims the trial court's decision to grant permanent custody to CCDCFS is against the manifest weight of the evidence. A trial court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have found that the essential statutory elements for an award of permanent custody have been established. *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2019, ¶ 22.

{¶ 23} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the five factors under R.C. 2151.414(B)(1)(a)-(e) exists and that permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

{¶ 24} R.C. 2151.414(B)(1) governs the first step in an agency's motion for permanent custody and contains five factors. *In re R.H.*, 8th Dist. Cuyahoga No. 111505, 2022-Ohio-3765, ¶ 21. Relative to this case, when a child is neither abandoned nor orphaned, the court considers whether the child has been in an agency's temporary custody for 12 out of 22 consecutive months. *Id.*; *see also* R.C. 2151.414(B)(1)(d).

**R.C. 2151.414(B)(1)**

{¶ 25} Under the first prong of the permanent custody analysis, the juvenile court made a finding as to each child under R.C. 2151.414(B)(1)(d) that the child had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. Mother does not contest this finding.

{¶ 26} "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1)(e). CCDCFS was granted emergency temporary custody of the children on January 28, 2020. The children were adjudicated dependent on August 13, 2020, and placed into the temporary custody of the agency.

{¶ 27} CCDCFS filed its complaint for permanent custody on December 13, 2021. Although not more than 12 months had passed between the time the children were placed in the temporary custody of the agency and the time the complaint for permanent custody was filed, because more than 12 months had passed between 60 days after the children were removed from their home and the date the complaint was filed, R.C. 2151.414(B)(1)(d) is satisfied.

{¶ 28} The court also made an additional finding as to each child that the child "cannot be placed with one of the child's parents within a reasonable period of time or should not be placed with either parent" pursuant to R.C. 2151.414(B)(1)(a) and made findings consistent with several R.C. 2151.414(E) subsections. However,

because the time requirements under R.C. 2151.414(B)(1)(d) were satisfied, it was unnecessary for the court to determine whether any additional factor under R.C. 2151.414(B)(1) was applicable to the circumstances presented in this case. *In re An.M.*, 8th Dist. Cuyahoga No. 111368, 2022-Ohio-2873, ¶ 33.

**Best Interest of the Children**

{¶ 29} Appellant argues in her first assignment of error that permanent custody was not in the best interest of the children. R.C. 2151.414(D)(1)(a) through (e) set forth the relevant factors that a court should consider in determining the best interest of a child. "The court must consider all the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 505, 2016-Ohio-5513, 857 N.E.2d 532. This court reviews a trial court's best-interest determination under R.C. 2151.414(D) for an abuse of discretion. *In re R.H.*, 8th Dist. Cuyahoga No. 111505, 2022-Ohio-3765, at ¶ 27, citing *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 55 (8th Dist.). "[T]he best interest determination focuses on the child, not the parent." *In re R.H.* at *id.*, citing *In re K.Z.*, 8th Dist. Cuyahoga No. 107269, 2019-Ohio-707, ¶ 85. While a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent custody determination, "there is not one element that is given more weight than the others pursuant to the statute." *In re Schaefer* at ¶ 56.

{¶ 30} In considering whether the grant of permanent custody was in each child's best interest, the court considered the following R.C. 2151.414(D)(1) factors:

"the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents" (R.C. 2151.414(D)(1)(a)); "the wishes of the child" (R.C. 2151.414(D)(1)(b)); "the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive 22 month period" (R.C. 2151.414(D)(1)(c)); "the child's need for a legally secure permanent placement" and "whether that type of placement can be achieved without a grant of permanent custody" (R.C. 2151.414(D)(1)(d)). Additionally, the court considered the GAL report.

{¶ 31} The record showed, by clear and convincing evidence, that the children could not be placed with appellant because she could not provide a safe and secure home for them. The children also could not be placed with their fathers or alleged fathers because they were either unknown, deceased, or incarcerated. The agency found no connection between the children and their paternal relatives and no other relatives who were willing or able to provide a permanent home for the children. The caseworker's testimony also revealed that the children's foster caregivers, which included maternal grandmother, were meeting their needs and the children were doing well in their placements. The children's custodial history showed that they had been in the agency's custody since January 2020.

{¶ 32} The court heard testimony from her agency caseworker, the children's therapist, and the GAL that, although appellant engaged in services, she did not benefit from those services. Appellant engaged with therapists at Signature Health,

and both her therapists, and her case manager testified that appellant was improving. However, appellant had not demonstrated that she consistently took her prescriptions and was not able to engage in mental health services with the children's mental health provider due to her behavior.

{¶ 33} Appellant completed parenting and anger management classes, but the agency terminated visitation with the children due to appellant's threatening behavior towards foster mother and the agency caseworker, which appellant displayed in front of the children. Appellant had not resumed visits with the children. Thus, appellant did not complete the parenting portion of her case plan.

{¶ 34} A review of the record therefore reveals clear and convincing evidence supporting the juvenile court's finding that permanent custody to the agency was in the children's best interest and the juvenile court did not abuse its discretion in awarding permanent custody of the children to CCDCFS.

{¶ 35} Accordingly, appellant's first and second assignments of error are overruled.

{¶ 36} In reviewing permanent custody proceedings, we are mindful that the power of the trial court to exercise discretion is particularly important. The knowledge obtained through contact with and observation of the parties cannot always be adequately conveyed to a reviewing court through a printed record. *See Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). "The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given

the nature of the proceeding and the impact the court's determination will have on the lives of the parties." *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994).

{¶ 37} We find the trial court acted in its discretion, consistent with clear and convincing evidence in the record, in terminating appellant's parental rights and committing M.J., M.L., and L.L. to the permanent custody of CCDCFS. The trial court's decision was neither against the children's best interests nor the manifest weight of the evidence. The assignments of error are overruled.

{¶ 38} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
CORNELIUS J. O'SULLIVAN, JR., JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EMANUELLA D. GROVES, J., CONCUR