[Cite as *In re I.J.*, 2026-Ohio-1191.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE I.J.                                              :

                                                        :          No. 115279

[Appeal by T.J., Father]                               :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 2, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. CU-11-110416 and SU-14-704092

---

### *Appearances:*

Robert C. Aldridge, for *appellant*.

Sarah R. Murray, *pro se*.

MARY J. BOYLE, J.:

{¶ 1} Appellant-father ("Father") appeals the juvenile court's judgment denying his motion to modify parental rights and responsibilities and granting, in part, appellee-mother's ("Mother") motion to modify parental rights and responsibilities. He raises the following six assignments of error for review:

> **Assignment of Error I:** The trial court abused its discretion when it did not exercise sound reasoning when it selectively applied the Local Rules.

**Assignment of Error II:** The trial court erred and abused its discretion in failing to grant [Father's] motion to remove the Guardian ad Litem ["GAL"] and motion to exclude the GAL report due to the failure to investigate the best interest of the minor child.

**Assignment of Error III:** The trial court erred and abused its discretion in failing to find that a change of circumstance had occurred.

**Assignment of Error IV:** The trial court erred in making modifications to the parenting order when the evidence failed to show that such modifications were in the best interests of the minor child.

**Assignment of Error V:** The trial court abused its discretion and erred when it ruled on a motion for GAL fees without an opportunity to respond or request a hearing pursuant to Local Rule 15(D)(5).

**Assignment of Error VI:** That the trial court's decision is against the manifest weight of the evidence.

{¶ 2} For the reasons set forth below, we affirm.

## I. Facts and Procedural History

{¶ 3} This appeal arises from motions by both parties to modify their 2016 parental rights and responsibilities agreement ("the agreement") regarding their now 15-year-old child, I.J. In the agreement, Mother was designated as the sole custodial and residential parent and Father was designated as the nonresidential and noncustodial parent. Father and Mother were never married and have been fighting over I.J.'s care and custody since 2016. The history of their disagreements and the underlying facts may be found in the parties' previous six appeals — *In re I.L.J.*, 2016-Ohio-7052 (8th Dist.) ("*In re I.L.J. I*"); *In re I.L.J.*, 2019-Ohio-5241 (8th Dist.) ("*In re I.L.J. II*"); *In re I.L.J.*, 2020-Ohio-5434 (8th Dist.) ("*In re I.L.J. III*"); *In re I.L.J.*, 2023-Ohio-2960 (8th Dist.) ("*In re I.L.J. IV*"); *In re I.L.J.*, 2024-Ohio-

454 (8th Dist.) ("*In re I.L.J. V*"); and *In re I.L.J.*, 2025-Ohio-376 (8th Dist.) ("*In re I.L.J. VI*").

{¶ 4} Relevant to this appeal, in June 2024, Mother filed a pro se motion asking the court to modify the following sections of the agreement: (1) local and international travel; (2) communication between parents; (3) child's activities; and (4) video communications or telephone calls. In response, Father filed his own motion to modify parental rights and responsibilities in August 2024. Father sought to change the agreement and become residential parent based on I.J.'s desire to change schools and play football at Valley Forge High School in Parma, where Father resides, instead of Shaker Heights, where I.J. attends school and resides with Mother and his half-brother.

{¶ 5} At a pretrial in September 2024, Father requested that the juvenile court conduct an in camera interview with I.J. and Mother requested a GAL. The court granted both requests. The court appointed a GAL the same day of the pretrial and held an in camera interview with I.J. in November 2024. In his interview, I.J. indicated that he wanted to reside with Father and play football at Valley Forge High School. The court found that I.J. "does have sufficient reasoning ability to express his wishes and concerns with respect to allocation of parental rights and responsibilities for his care. [I.J.] is intelligent and articulate." (Journal entry, Nov. 26, 2024.)

{¶ 6} The matter proceeded to trial in December 2024, and was continued to two dates in February 2025. Mother and Father appeared at all dates, with

Mother proceeding pro se and Father represented by counsel. The testimony at trial consisted of Mother, Father, I.J.'s half-brother, and the GAL.

{¶ 7} In January 2025, following the first trial date, Father filed a motion to remove the GAL and exclude her report, alleging that the GAL failed to comply with the local rules of juvenile court and the Ohio Rules of Superintendence governing GALs. Then on February 7, 2025, Father filed a supplemental motion to modify parental rights and responsibilities, alleging that Mother did not share I.J.'s medical information with him in violation of the "illness or injury of a child" section of the agreement.

{¶ 8} At the next trial date on February 13, 2025, the court "struck and gave no weight to any of the GAL's opinions as to a 'change of circumstance.'" (Journal entry, May 27, 2025.) The court allowed the GAL to orally report on her investigation and offer an opinion as to the child's "best interest." The matter then concluded on February 14, 2025. The testimony consisted of Mother and Father, which the court noted was "not corroborated by other witnesses or documents, except [for I.J.'s half-brother] and the GAL's investigation." (Journal entry, May 27, 2025.) Mother and Father both testified as to the reasons why the agreement should be modified in their favor.

{¶ 9} Mother testified as to past issues with Father's travel itineraries with I.J. Mother stated that Father either provided late notice or incomplete itineraries. Mother wanted the agreement to include the requirement that Father include the travel location with the notification to travel. Mother also indicated that Father was

previously found in contempt in 2022 for not revealing I.J.'s location, disabling I.J.'s cell phone GPS, and taking I.J. to an unknown location.

{¶ 10} Father testified regarding his displeasure about having to give notices to travel beyond state lines. According to Father, giving notice to travel beyond state lines was arbitrary and did not allow him and I.J. to travel spontaneously for a relatively short distance. Father's sister is a flight attendant, which in some cases means that he does not get the full itinerary until the night before "because the flight load changes." (Tr. 222.) His concern is that when they travel by plane there may be some circumstances where he would not know their final destination until three days before their trip.

{¶ 11} With regard to telephone access to I.J., Father testified that he wanted I.J. to have two cell phones — the cell phone that Mother purchased for I.J. to use while in her possession and a second cell phone Father purchased for I.J. to use only when he is in Father's possession. Mother testified that she wants I.J. to have only one cell phone for which she will be financially responsible. I.J. expressed concern about having two cell phones. He believes that having two cell phones will interfere with his communication with friends and make things more complicated.

{¶ 12} Mother testified that she wanted the costs and fees billed by the school, including lunches, field trips, activities, and supplies to be shared by both parents. Father opposed Mother's meal calculation because it did not consider when he packs I.J. lunch for school. Father was also opposed to not being notified of school expenses or field trips before the event occurred.

{¶ 13} Father testified about I.J.'s interest in football and the need for I.J. to attend a school where his teammates are serious about the sport. According to Father, I.J. expressed to him his dissatisfaction with the Shaker Heights football program. Father believed that Valley Forge High School in Parma, which is near Father's house, was the better choice for I.J. because I.J. has told Father that he wants "a fresh start" and "a clean slate." (Tr. 402.) Father indicated that he had a "fresh start" as a kid, which helped him.

{¶ 14} Father and Mother discussed a potential change of schools for I.J. Mother was open to the idea of I.J. switching schools, depending on the school, location, and academics. Mother provided Father a list of several schools that had a good football program and good academics. Father did not agree with any of Mother's recommendations for various reasons, including tuition expenses, uniform requirements, the all-male student body, the distance from Father's house, and the religious teaching of Catholic schools. The only school acceptable to Father was Valley Forge High School.

{¶ 15} Mother testified that she did not agree with a transfer to Valley Forge or any other high school that was a "lower-rated worse academic school" than Shaker Heights. (Tr. 81.) Mother also testified that Valley Forge's win-loss record in football was no better than Shaker Heights record.

{¶ 16} Father has lived in Parma for 14 years. I.J., however, has no friends in Parma and is not familiar with Valley Forge High School or its student body and faculty. Father testified that a change was needed because, within the past two years,

I.J. was "jumped" in his neighborhood; I.J. was threatened in the boys' bathroom at school; I.J. was threatened after a student jumped off a school bus and struck him; and I.J. was kicked after practice.

{¶ 17} Mother testified that the kicking incident occurred when a student kicked I.J. and I.J. punched the student in retaliation. At the time of the incident, Father was nearby and took I.J. to the football coach to explain. According to Mother, the incident was not reported to school administration and Father did not notify her about the incident until a month after it occurred. The bathroom incident involved boys pushing and arguing. Mother testified there were no injuries and the incident was not reported to school administration. The bus incident occurred when I.J. threw something at a school bus window and a student sitting at the window jumped off the bus and struck or threatened I.J. This incident was also not reported.

{¶ 18} Both Mother and Father testified I.J. did well academically when he attended Bedford Elementary School. Mother and I.J. then moved to Shaker Heights where I.J. received A's and B's in sixth and seventh grades. As an eighth grader, I.J.'s grades were not good. At the beginning of the year, he received B's and C's except for Algebra and Spanish. In the last full grading period, he received an A in Science, a low C, some D's, and an F in Algebra. Mother testified that I.J. is enrolled in RaiderTime, which is a program offered by Shaker Heights schools for homework and grade assistance, she obtained a private tutor, and talked to I.J.'s teachers to help with I.J.'s grades. Father testified that he helps I.J. with his assignments and also talked with the teachers. Father testified that while I.J. is with

him, he reduces I.J.'s video game time and phone privileges until I.J. completes his homework.

{¶ 19} The GAL testified her "recommendation in the minor's best interest is that the child remain in the legal custody of his mother." (Tr. 677.) The GAL noted that throughout the course of her investigation, she had the opportunity to meet and speak with I.J. on three occasions. And while I.J. stated that his desire was to live with Father and go to school in Parma, "he was never able to develop that or substantiate the reason why." (Tr. 678.) According to the GAL, I.J. never went to Valley Forge to observe or shadow anyone; he does not know any students there; he does not know anything about the curriculum and neither did Father.

{¶ 20} I.J. did not disclose any issues or conflicts with Mother, his half-brother, or Father, as well as his extended family. When the GAL asked him what does a "fresh start" mean "for someone so young," I.J. replied, "I don't want anyone to know me, I don't want anyone to know anything about me." (Tr. 680.) The GAL felt that was odd for "someone of tender years to want a fresh start" when I.J. could not "express any real issues of concern." (Tr. 680.)

{¶ 21} With regard to football, the GAL testified that she investigated both the Shaker Heights and Valley Forge programs and stated that "Shaker Heights is far superior to Valley Forge." (Tr. 682.) As to academics, the GAL testified that "the Parma City School District is inferior to Shaker Heights." (Tr. 686-687.) The GAL stated:

Shaker Heights is superior with regard to academics, sports, diversity, parent-teacher ratios, clubs and activities.

Every category Shaker was superior to Parma.

Back to [I.J.'s] expressed desire and not being able to develop it, I was surprised that he literally didn't know anything about the school to which he was expressing a desire to attend.

Not knowing anyone, not knowing the coach, coaching staff, student body, players, no one, and likewise father didn't either.

. . .

I do believe that it's in [I.J.'s] best interest to remain at the superior school and because of what I know regarding his talent as an athlete, the better athletic program to enhance him as a young man and a player is Shaker.

There is nothing known to me that Parma can offer this young man to promote him.

(Tr. 687-688.)

{¶ 22} As to the issues with I.J.'s grades, the GAL testified that if the poor grades were caused by attitude and laziness like the school believes, then I.J. needs assistance in finding a way to remedy that. The GAL did not believe that a change in schools would solve the problem and that he would be better suited in Shaker.

{¶ 23} Following the conclusion of the February 14 hearing, the parties submitted closing arguments. On May, 27, 2025, the court issued a well-written judgment entry denying Father's motion to modify parental rights and responsibilities and granting, in part, Mother's motion to modify the parties' parenting plan. Finding that a modification was in I.J.'s best interest, the court modified the agreement in the following ways, relevant to this appeal:

a) <u>For Travel</u>:

   <u>Travel in United States</u>:  Five (5) days' notification, with itinerary, shall be given by parent traveling with [I.J.] by text, email, or in writing that other parent receives at their home five (5) days prior to travel.

b) <u>Local travel</u>:  Any travel less than two hundred (200) miles from traveling parent's home to destination, not overnight, shall require no notification to other parent.

c) <u>International Travel</u>:  The full itinerary shall be provided seven (7) days in advance of travel.  Each parent may reach [I.J.] by cell phone or video chat once a day but not to interfere with [I.J.]'s activities. Because of Father's benefits of travel from family members, if there is a change of itinerary, Father may amend the same by **immediately** contacting Mother with the change by text or email. The same applies for travel in United States.

d) <u>Video Communication or Telephone Calls</u>: [I.J.] may contact either parent at any time without interference.  [I.J.] shall be given one cell phone for his personal use and to be used to contact or receive contact from either parent.  No parent shall interfere with [I.J.]'s contact with either parent.  Mother shall be responsible for the cost of the cell phone up to One Hundred Fifty Dollars ($150.00) per month.  Any charge or expense in excess of $150 per month shall be equally divided by the parents fifty-fifty (50/50).  Father may disable the GPS feature while [I.J.] is in his possession but neither party shall disable any application or feature designed to locate the cell phone or [I.J.].

e) <u>Cost of Child's Activities</u>:  All costs incurred as a result of a mandatory school-related activity or an optional school activity shall be paid as follows.

   1.  Any charge less than $150, each parent will pay one-half (1/2) fifty-fifty (50/50).

   2.  School lunch costs shall be the responsibility of the parent in possession the night before.  If a parent prepares school lunch, the parent will not be charged for the school lunch.

   3.  All other expenses shall be divided per Exhibits A and B, prior Court Orders

(Emphasis in original.) (Judgment entry, May 27, 2025.)

**{¶ 24}** Furthermore, the court found that

Father's Motion to Modify Parental Rights and Responsibilities as well as his Supplemental Motion fails because a "change of circumstances" and "best interest" have not been proved. . . .

Further, the Court **ORDERS** family counseling. Mother shall select three (3) possible certified family counselors covered through her insurance in close proximity to the parties, and Father shall choose one (1) of the three and notify Mother. Mother shall schedule an appointment so that Father, Mother, and [I.J.] attend. The appointment shall not be scheduled during Father's parenting time or work hours.

The Court does not **ORDER** but suggests Mother, Father, and [I.J.] consult the family counselor about a possible compromise for [I.J. and] find a school which has a good football program and excellent academics.

(Emphasis in original.) (Judgment entry, May 27, 2025.)

**{¶ 25}** Father now appeals, raising six assignments of error, which shall be discussed together and out of order where appropriate.

## II. Law and Analysis

### A. The Local Rules

**{¶ 26}** In the first assignment of error, Father argues that the juvenile court erred when it selectively applied Loc.R. 36 and 37 of the Cuyahoga County Court of Common Pleas, Juvenile Division, by allowing Mother's witness to testify even though her witness list was untimely filed but by excluding some of the evidence Father indicated on his supplemental exhibit list, which was also untimely filed.

**{¶ 27}** In *Citibank, N.A. v. Katz*, 2013-Ohio-1041 (8th Dist.), we stated:

"'[C]ourts are to be given latitude in following their own local rules; the enforcement of rules of court is held to be within the sound discretion of the court.'" *In re T.W.*, 8th Dist. Nos. 88360 and 88424, 2007-Ohio-1441, ¶ 38, quoting *Ciokajlo v. Ciokajlo*, 1st Dist. No. C-810158, 1982 Ohio App. LEXIS 12823, *4 (July 28, 1982); *see also Dodson v. Maines*, 6th Dist. No. S-11-012, 2012 Ohio 2548, ¶ 47 ("[L]ocal rules are of the court's own making, procedural in nature, and not substantive principles of law.") (Citations omitted.) So long as a trial court's failure to comply with or enforce its local rules does not affect due process or other constitutional rights, "there is no error when, in its sound discretion, the court decides that the peculiar circumstances of a case require deviation from its own rules." *Id.* (Citations omitted.); *see also Wallner v. Thorne*, 189 Ohio App.3d 161, 2010 Ohio 2146, 937 N.E.2d 1047, ¶ 21 (9th Dist.).

*Id.* at ¶ 29. We note that an abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 28} In this case, Mother filed her witness list on December 4, 2024, which was seven days prior to the start of trial on December 11, 2024. Father objected to Mother's untimely witness list. Juv.Loc.R. 36(A), which governs witness lists, provides that "witness lists shall be exchanged no later than fourteen (14) days prior to the trial date[.]" Under the rule, however, the court may, "in its discretion allow any party to call any witness whose name is not on a witness list, when doing so will serve the interest of justice." Juv.Loc.R. 36(B).

{¶ 29} Father filed his supplemental exhibit list the day before trial on December 10, 2024. Mother objected to Father's use of the supplemental exhibits, arguing that the list was untimely filed. Juv.Loc.R. 37, which governs exhibits, provides that "[a]n index of the exhibits to be used at trial, along with a brief

description of such exhibits, shall be filed and served upon opposing counsel no later than one week before the final pretrial and updated no less than one week before the trial." Juv.Loc.R. 37(B).

{¶ 30} A review of the record reveals that the juvenile court heard arguments from both Mother and Father and addressed both the witness list and supplemental exhibit list prior to the start of trial. With regard to Mother's witness list, Mother only had one witness listed, I.J.'s adult, half-brother, who lives with Mother and I.J. The court overruled Father's objection and allowed I.J.'s half-brother to testify, stating that "it shouldn't surprise you that somebody in [Mother's] household could be a witness." (Tr. 25.) The court noted that it gave Father "generous latitude, so [it was going to] give [Mother] generous latitude too." (Tr. 24-25.) Juv.Loc.R. 36(B) gives the court discretion to "allow any party to call any witness whose name is not on a witness list, when doing so will serve the interest of justice." And that is exactly what the court did in this case. Furthermore, I.J.'s half-brother did not testify until the last day of trial in February 2025, so Father had adequate time to prepare. We do not find that the juvenile court abused its discretion by allowing I.J.'s half-brother testify at trial.

{¶ 31} As to Father's supplemental exhibit list, the court noted that Father had eight items on his list and then went through each item to determine "whether there's any prejudice that attaches to any of these exhibits." (Tr. 18-19.) The court stated, "[I]f [M]other has knowledge or has possession of some of these things, then she's not prejudiced . . . even if due process is not denied, if she had possession of

these things or had the ability to have these things." (Tr. 19.) Ultimately, the juvenile court sustained Mother's objection pertaining to I.J.'s private tutoring records because Mother did not have access to them. The court also limited Father's use on two other items on his supplemental exhibit list pertaining to recordings of the conversations between Father and the GAL and Father's phone logs. The court found that these exhibits could not be used in Father's case-in-chief, but could be used for credibility issues. We do not find that this was a selective application of the local rules as Father contends. Rather, the court thoroughly reviewed each item on Father's supplemental exhibit list and exercised sound discretion and latitude when making its determination.

{¶ 32} Therefore, the first assignment of error is overruled.

## B. Parental Rights and Responsibilities

{¶ 33} In the third and fourth assignments of error, Father challenges the modifications the juvenile court made to the agreement and argues the court abused its discretion when it failed to find a change in circumstances.

{¶ 34} We previously set forth our standard of review in *In re I.L.J. IV*, as follows:

> Under R.C. 3109.04(E)(1)(a), a trial court shall not modify a prior decree allocating parental rights and responsibilities unless it finds[, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree,] that there has been a change in the circumstances of the child or the child's residential parent, and the modification is necessary to serve the best interest of the child. The requirements of R.C. 3109.04(E)(1)(a) apply to motions to change the designation of residential parent and legal custodian of the child, not to modification of parenting time or visitation rights. *In*

*re F.T.*, 8th Dist. Cuyahoga Nos. 108934 and 108935, 2020-Ohio-1624, ¶ 52, 154 N.E.3d 245; *see also Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, ¶ 26. Here, Father's motion included a request that he be named the sole residential parent but the trial court denied the motion. Further, although the court modified various provisions of the shared-parenting plan, it made no changes to its earlier decree designating Mother as the residential parent. Accordingly, R.C. 3109.04(E)(1)(a) does not apply to our review of the trial court's modifications to the shared parenting agreement. *See In re A.M.*, 8th Dist. Cuyahoga No. 111603, 2023-Ohio-1366, ¶ 76 (where court denied father's request to modify the allocation of parental rights and responsibilities to name him the sole residential parent, R.C. 3109.04(E)(1)(a) did not apply to appellate court's review of trial court's modifications to the parties' shared-parenting plan).

Instead, our review is governed by R.C. 3109.04(E)(2)(b), which provides:

> The court may modify the terms of the plan for shared parenting approved by the court and incorporated by it into the shared parenting decree upon its own motion at any time if the court determines that the modifications are in the best interest of the children or upon the request of one or both of the parents under the decree. Modifications under this division may be made at any time. The court shall not make any modification to the plan under this division unless the modification is in the best interest of the children.

Unlike R.C. 3109.04(E)(1)(a), which states that modification of the designation of residential parent and legal custodian requires a determination that a change in circumstances has occurred and a finding that the modification is in the best interest of the child, "R.C. 3109.04(E)(2)(b) requires only that the modification of the shared-parenting plan be in the best interest of the child." *Fisher* at ¶ 34. The Ohio Supreme Court has explained that the best-interest standard in R.C. 3109.04(E)(2)(b) is lower than that contained in R.C. 3109.04(E)(1)(a) because factors in a shared-parenting plan such as which school the child will attend or the physical location of the child during holidays are not as critical to the life of a child as the designation of the child's residential parent and legal custodian. *Id.* at ¶ 36.

Because under the lower standard of R.C. 3109.04(E)(2)(b) there is no requirement that the trial court find a change in circumstances before modifying a shared-parenting plan, Father's argument that the court

erred in modifying the plan without finding a change in circumstances is without merit.

With respect to the best interest determination, we recognize that the trial court incorrectly cited R.C. 3109.04(E)(1)(a) in its entry regarding its modifications to the shared-parenting plan. It also incorrectly cited the best interest factors contained in R.C. 3109.04(F)(1). *See Campana v. Campana*, 7th Dist. Mahoning No. 08 MA 88, 2009-Ohio-796, ¶ 3 (the best interest factors listed in R.C. 3109.04(F)(1) are used only for custody modification motions; the best interest factors in R.C. 3109.051(D) are applied to parenting time and visitation modifications).

. . .

A reviewing court will not overturn a trial court's modification of a parenting agreement absent an abuse of discretion. *Masters v. Masters*, 69 Ohio St.3d 83, 85, 1994-Ohio 483, 630 N.E.2d 665 (1994).

*Id.* at ¶ 35-39, 43.

{¶ 35} Here, the court correctly found, based on *In re I.L.J. IV*, that Father's motion was to be reviewed under R.C. 3109.04(E)(1)(a), which first requires a "change in circumstances" before reaching the "best interest" determination under R.C. 3109.04(F)(1), and Mother's motion was to be reviewed under R.C. 3109.04(E)(2)(b), which only requires the child's "best interest" determination under R.C. 3109.051(D). We in turn will review the juvenile court's findings for each motion under the appropriate standard for an abuse of discretion. *Id.* at ¶ 43, citing *Masters*.

### 1. Change in Circumstances

{¶ 36} In this case, the juvenile court noted that Father offered the following four reasons for the change in circumstances: (1) I.J. wishes to have a "fresh start" outside of Shaker Heights school system and desires to play football outside of

Shaker Heights; (2) I.J.'s poor grades; (3) the passage of time since the May 2016 parenting order; and (4) the breakdown in communication between Mother and Father. Because these reasons are intertwined, we will discuss them together.

{¶ 37} Father argues that while the wishes of a child alone do not automatically amount to a change of circumstances, various appellate districts have found scenarios where the child's wishes can meet the threshold on a case-by-case basis. As to what factors to look for in determining whether a child's wishes raise to the level of a change in circumstances, Father cites to several cases from other districts that have considered the passage of time since the prior order, the child's maturity, and the child's age, including *Boone v. Kaser*, 2001 Ohio App. LEXIS 3906 (5th Dist. Aug. 28, 2011); *Wilson v. Wilson*, 2009-Ohio-4978 (4th Dist.); *Khulenberg v. Davis*, 1997 Ohio App. LEXIS 3753 (12th Dist. Aug. 25, 1997); and *Butland v. Butland*, 1996 Ohio App. LEXIS 2773 (10th Dist. June 27, 1996).

{¶ 38} The only case Father cites to from the Eighth District in support of his position in this regard is *In re J.C.*, 2019-Ohio-107 (8th Dist.), which relies on one factor — the passage of time. In *In re J.C.*, we found that the "court committed prejudicial error by not considering facts that occurred since the prior custody decree when concluding that there was no change in circumstances." *Id.* at ¶ 30. Those facts included: (1) the eight and one-half years that had passed between the original custody decree and the court's journal entry denying Mother's motion for a custody modification; (2) the children's ages were three and one when Father was granted custody, and they were ages 12 and nine when Mother's motion was denied;

(3) Mother moved to the children's school district but had lived approximately two hours away when the court granted Father custody in 2009; and (4) when Father was awarded custody, his mother was the primary caregiver for the children, but at the time of denial, Father lived with his girlfriend, who was then the primary caregiver for the children. *Id.* at ¶ 28-29.

{¶ 39} When looking at the passage of time in this case, nine years passed between the original agreement and the court's journal entry denying Father's motion for modification. And while I.J. was five when Mother was granted sole custody and 14 years old when Father's motion was denied, Father failed to demonstrate that the passage of time resulted in a change in circumstances for I.J. or Mother. The juvenile court considered Father's "fresh start" argument and I.J.'s wishes during the in camera interview and found that there was no change in circumstances. Moreover, the GAL asked I.J. what he meant by wanting a "fresh start" and I.J. replied, "I don't want anyone to know me, I don't want anyone to know anything about me." (Tr. 680.) The GAL felt that was odd for "someone of tender years to want a fresh start" when he could not "express any real issues of concern." (Tr. 680.)

{¶ 40} Furthermore, I.J.'s wishes to reside with Father and play football at Valley Forge High School in Parma are insufficient to warrant a change in circumstances. A review of the record reveals that Mother was willing to compromise to Father's request by recommending several schools with a good

football program and academics, but Father ruled out all of Mother's suggestions for various reasons. The only high school acceptable to Father was Valley Forge.

{¶ 41} The suggested change to Valley Forge, however, was not thoroughly investigated. Father offered no testimony or exhibits regarding the school's academic program, student body, faculty, or support programs for I.J. Neither Father nor I.J. had toured the school, and there was no testimony that I.J. knew any students who attended Valley Forge. Additionally, Father failed to offer any testimony as to the quality of the football program, coaching staff, or future teammates at Valley Forge. The GAL contacted the Shaker Heights football coach and the Valley Forge coach to see how I.J. would fit in their program. The Shaker Heights coach indicated I.J. had skills but he needed to work on his speed and conditioning, and the Valley Forge coach never returned the GAL's call.

{¶ 42} In its journal entry, the juvenile court noted that football should not be the reason for a modification of custody unless there is a substantial or material change to I.J. or Mother as the residential parent. "No proof was offered as to the effect (positive or negative) that would occur to I.J. if custody was modified to Father. No school official or coach for either Valley Forge or Shaker Heights testified. . . . A modification for football does not meet O.R.C. 3109.04(E)(1)(a) requirements." We agree with the court's determination.

{¶ 43} Next, Father argues that the recent change in I.J.'s grades is a change in circumstances. At trial, the evidence demonstrated that I.J. received A's and B's in sixth and seventh grades in Shaker Heights. As an eighth grader, I.J. received B's

and C's except for Algebra and Spanish. In the last full grading period, he received an A in Science, a low C, some D's, and an F in Algebra. In response to I.J.'s decline in grades, Mother enrolled I.J. in RaiderTime, which is a program offered by Shaker Heights schools for homework and grade assistance. Mother also obtained a private tutor and talked to I.J.'s teachers to help I.J. Father testified that he helps I.J. with his assignments and also talked with the teachers. The GAL contacted I.J.'s teachers who indicated that I.J.'s poor grades are reflective of his lack of focus and effort, laziness, not turning in his homework on time, and the need for better study habits.

{¶ 44} The court stated that I.J.'s poor grades appear to be because his "recent lack of desire to achieve or laziness" and "may have been affected by the present litigation." (Journal entry, May 27, 2025.) The court aptly noted that the lack of testimony, school records, or testimony of counselors from the school made it difficult for the court to infer that a change of residence would affect I.J.'s grades or motivation. Indeed, no evidence was offered as to why Valley Forge would offer any different academic plan or result than Shaker Heights. We agree with the juvenile court that this is not a change in circumstances as contemplated by the statute.

{¶ 45} Father's final reason for a change in circumstances is the breakdown in communication between Mother and Father. Father contends that Mother's continued pattern of failing to provide reasonable notice regarding I.J.'s medical well-being, school events, and her continuous attempts to amend terms of the parenting plan support the finding of a change in circumstances.

{¶ 46} In addressing this issue, the juvenile court noted that Father can obtain almost all the information he seeks from the school. The court acknowledged that Mother has failed to communicate effectively all medical appointments consistently, but corrected that issue by modifying the agreement. The court further noted that the breakdown in communication was an ongoing issue and not a change in circumstances. The court stated, I.J. "has not been harmed by any of the alleged infractions of notice to Father. In the future, Father may file a contempt motion for failure to abide by the clarified Order." (Journal entry, May 27, 2025.) We agree with the juvenile court — Father failed to demonstrate that the communication issues constituted a change in circumstances.

{¶ 47} Lastly, Father contends the juvenile court erroneously held him to a higher standard than in the statute by stating in its order that he must prove "a substantial 'change of circumstances.'" (Journal entry, May 27, 2025.) We note that the Ohio Supreme Court has held that for a trial court to make the threshold finding of a change in circumstances, "the change must be a change of substance, not a slight or inconsequential change. The nomenclature is not the key issue." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). The *Davis* Court explained:

> "The clear intent of that statute is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the children a 'better' environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out of custody may be able to prove that he or she can provide a better environment."

*Id.*, quoting *Wyss v. Wyss*, 3 Ohio App.3d 412, 416 (10th Dist. 1982).

{¶ 48} Here, the juvenile court issued a detailed analysis of each change in circumstances alleged by Father and concluded that Father failed to prove any material change that would satisfy the standard set forth in R.C. 3109.04(E)(1)(a). The court found that "Father's motion, while stating what Father believed was a [] change of circumstances pursuant to [R.C.] 3109.04(E)(1)(a), was illusory and not proved to be material or a change of substance." (Journal entry, May 27, 2025.)

{¶ 49} Upon review, we agree with the juvenile court. The court did not abuse its discretion in finding no change in circumstances based on the four reasons Father alleged, and therefore was not required to proceed to a best interest analysis. There is ample evidence in the record supporting the juvenile court's findings.

## 2. Best Interest of the Child

{¶ 50} Next, Father argues that the juvenile court made several revisions to the agreement that are not in I.J.'s best interest. Specifically, Father argues: (1) the notice requirements for the travel revisions are arbitrary and harmful to I.J.; (2) the modification requiring I.J. to have one cell phone provided by Mother is not in I.J.'s best interest; and (3) requiring Father to pay for school lunches and other activities is in Mother's best interest, not I.J.'s.

{¶ 51} When making a best interest determination under R.C. 3109.051(D), the court shall consider all of the following factors, in relevant part:

> (1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship[;]

(2) The geographical location of the residence of each parent and the distance between those residences[;]

(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4) The age of the child;

(5) The child's adjustment to home, school, and community;

(6) If the court has interviewed the child in chambers, pursuant to division (C) of this section, regarding the wishes and concerns of the child as to parenting time by the parent who is not the residential parent . . ., as to a specific parenting time or visitation schedule . . . the wishes and concerns of the child, as expressed to the court;

(7) The health and safety of the child;

(8) The amount of time that will be available for the child to spend with siblings;

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights[;]

(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child[;]

. . .

(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

. . .

(16) Any other factor in the best interest of the child.

We note that, in general, absent any evidence to the contrary, "a reviewing court will presume that the trial court considered the relevant statutory factors." *In re I.R.Q.*, 2018-Ohio-292, ¶ 15 (8th Dist.), citing *Quint v. Lomakoski*, 2006-Ohio-3041 (2d Dist.).

{¶ 52} Here, the juvenile court modified the agreement to eliminate the notice requirement for nonovernight travel within two hundred miles and required that the parent traveling with I.J. give the other parent five days of notification prior to travel within the United States and seven days for international travel. Father contends that the notification requirements limit his ability to take advantage of his travel benefits and are not in I.J.'s best interest. Additionally, the court ordered that I.J. have one cell phone. Father contends that this obligates him to the risk and responsibility of Mother's property. The court modified the school lunch obligation to be paid by the parent in possession the night before and split the costs of activities that are less than $150. Father complains that these modifications were in Mother's best interests not I.J.'s. We disagree with Father's contentions.

{¶ 53} Throughout the proceedings the court was cognizant of the acrimonious history between Mother and Father. The court determined that neither Mother nor Father is flexible. The court addressed the factors set forth in R.C. 3109.051(D), considered the GAL's testimony, conducted an in camera interview with I.J., and concluded that the modifications to the agreement were in I.J.'s best interest. The travel notice requirements establish a clear deadline and

address any last-minute changes to travel plans, thereby resolving an issue that has been an ongoing source of conflict between the parties.

{¶ 54} With regard to the cell phone, the court stated in its modification to the agreement that "Father may disable the GPS feature while [I.J.] is in his possession but neither party shall disable any application or feature designed to locate the cell phone or [I.J.]." While Father claims that this is a "technological impossibility," both parties concede and we find that the court devised a compromise between Mother and Father and took I.J.'s request into consideration by ordering one cell phone for I.J. and allowing Father to retain the ability to disable the GPS while I.J. is in his possession. *See* Father's appellate brief, p. 21 ("While it might be the result of technological naivety, the intent of the court seemed to be to address [Father's] concerns about the location tracking, but these specific requirements are fundamentally conflicting.") And Mother's appellate brief, p. 26 ("[Father's] claim of 'technological impossibility' is hyper-technical and designed to frustrate the Trial Court's clear intent to ensure the child has a single, functional device while respecting [Father's] concerns about surveillance.").

{¶ 55} Lastly, as to the school lunches and expenses, the court clarified the agreement by ensuring that I.J.'s school lunches, activities, and field trips were shared by both parents to address the dispute over what Father considers is "school costs."

{¶ 56} After thoroughly reviewing the record in this case and applying the relevant factors and applicable law, we find no abuse of discretion on the part of the

juvenile court for modifying the agreement. The juvenile court's modifications serve I.J.'s best interests.

{¶ 57} Therefore, the third and fourth assignments of error are overruled.

{¶ 58} We note that in Father's sixth assignment of error, he argues that the juvenile court's decision was against the manifest weight of the evidence. Father, however, fails to include the authority upon which he relies in support of his sixth assigned error. "Ohio courts have consistently held that '[a]n appellate court may disregard an assignment of error pursuant to App.R. 12(A)(2) if an appellant fails to cite to any legal authority in support of an argument as required by App.R. 16(A)(7).'" *Chrzanowski v. Chrzanowski*, 2025-Ohio-2690, ¶ 15 (8th Dist.), quoting *Strauss v. Strauss*, 2011-Ohio-3831, ¶ 72 (8th Dist.), and citing *Hausser & Taylor, LLP v. Accelerated Sys. Integration, Inc.*, 2005-Ohio-1017, ¶ 10 (8th Dist.) ("It is not the duty of this court to sort through the record to root out arguments and evidence in support of an appellant's assignment of error."); *Shaker HTS ex rel. Lake v. Shaker Hts.*, 2024-Ohio-3007, ¶ 25 (8th Dist.) ("Appellate courts are not advocates, and the appellant bears the burden of constructing the legal arguments necessary to support their assignments of error."); and *State v. Moore*, 2019-Ohio-2633, ¶ 12 (3d Dist.) ("Moore's failure to cite *any* legal authority to support his arguments that the trial court erred in some capacity renders his assignment of error a nullity pursuant to App.R. 12(A)(2)." (Emphasis in original.)). Nevertheless, we addressed Father's concerns with the juvenile court's determination in the third and

fourth assignments of error. Therefore, pursuant to App.R. 12(A)(2) and 16(A)(7), we disregard Father's sixth assignment of error.

**C. The GAL's Report**

{¶ 59} In the second assignment of error, Father contends that the juvenile court erred when it failed to grant his motion to remove the GAL and exclude the GAL's report.

{¶ 60} Father maintains that the juvenile court should have granted his motion to remove the GAL and exclude the GAL's report because the GAL failed to investigate the best interest of the child in contravention of the court's September 11, 2024 journal entry appointing the GAL. In this entry, the court ordered that the GAL "is to . . . assist in determining the best interest of the child." (Journal entry, Sept. 11, 2024.) The court further ordered that the GAL "shall comply with Rule 48 of the Rules of Superintendence for the Courts of Ohio and Rule 18 of the Cuyahoga County Local Rules of the Court of Common Pleas, Juvenile Division [and] . . . Local Rule 15 of the Cuyahoga County Rules [of the] Court of Common Pleas, Juvenile Division." (Journal entry, Sept. 11, 2024.) Father argues that the GAL failed to comply with the local rules and Sup.R. 48.03(A)(5) when the GAL did not notify the court of the conflict between I.J.'s wishes to reside with Father and attend Parma Schools and her recommendation that Mother continues to be the residential parent and legal custodian of I.J.

{¶ 61} The role of a GAL is to protect the child's interest, ensure that the child's interests are represented throughout the proceedings, and assist the trial

court in its determination of what is in the child's best interest.  Sup.R. 48.03.

Relevant to this case, Sup.R. 48.03(A) and Juv.Loc.R. 15 and 18 address the role and

responsibilities of the GAL.  Juv.Loc.R. 15 governs the appointments of GALs and

states that "(G) **Responsibilities of a Guardian ad Litem**[.]  A Guardian ad

Litem shall comply with all requirements as listed in Sup. R. 48-48.07." (Emphasis

in original.)  Sup.R. 48(A)(1) and (5) provide in relevant part:

> (A) **General responsibilities**
>
> The responsibilities of a guardian ad litem shall include, but are not limited to, the following:
>
> (1) Provide the court recommendations of the best interest of the child. Recommendations of the best interest of the child may be inconsistent with the wishes of the child or other parties.
>
> . . .
>
> (5) Upon becoming aware that the recommendations of the guardian ad litem differ from the wishes of the child, immediately notify the court in writing with notice to the parties or affected agencies.  The court shall take action as it deems necessary.

(Emphasis in original.)

{¶ 62} Juv.Loc.R. 18(G) addresses the content of the GAL's report and

provides:

> Each Guardian ad Litem Report shall detail the following when disclosure is in the best interests of the child:
>
> . . .
>
> (10) Specific recommendations, including recommendations of disposition, and the Guardian ad litem's reasons for that position;
>
> (11) All other recommendations, suggestions or concerns that the Guardian ad litem can identify as in the child's best interests[.]

{¶ 63} As this court has previously recognized, "'Sup.R. 48 provides [. . .] good guidelines for the conduct of a guardian ad litem in meeting his or her responsibilities in representing the best interest of a child in order to provide the court with relevant information and an informed recommendation.'" *In re C.O.*, 2013-Ohio-5239, ¶ 14 (8th Dist.), quoting *In re K.G.*, 2010-Ohio-4399, ¶ 12 (9th Dist.). The Rules of Superintendence are only "'general guidelines for the conduct of the courts'" and "'do not create substantive rights in individuals or procedural law.'" *In re C.O.* at ¶ 14, quoting *In re K.G.* at ¶ 11, *Sultaana v. Giant Eagle*, 2008-Ohio-3658, ¶ 45 (8th Dist.).

{¶ 64} "As such, it has been generally held that a guardian ad litem's failure to comply with Sup.R. 48 is not, in and of itself, grounds for reversal of a custody determination." *In re K.Z.*, 2019-Ohio-707, ¶ 72 (8th Dist.), citing *In re C.O.* at ¶ 14; *In re N.B.*, 2017-Ohio-1376, ¶ 26 (8th Dist.); *Miller v. Miller*, 2014-Ohio-5127, ¶ 14-18 (4th Dist.). And as we discussed above, the enforcement of local rules is generally within the sound discretion of the court. Therefore, as "'long as a trial court's failure to comply with or enforce its local rules does not affect due process or other constitutional rights, "there is no error when, in its sound discretion, the court decides that the peculiar circumstances of a case require deviation from its own rules."'" *In re K.Z.* at ¶ 73, quoting *Katz*, 2013-Ohio-1041, at ¶ 29 (8th Dist.), quoting *Dodson v. Maines*, 2012-Ohio-2548, ¶ 47 (6th Dist.).

{¶ 65} Here, Father takes issue with the opinion the GAL expressed in her report. According to Father, rather than making a "best interest of the child

determination" as the court mandated, the GAL instead opined that "Father has not shown a substantial change of circumstances to warrant a change of custodian status in this case." (GAL report, Dec. 4, 2024.) Father contends that this recommendation is outside the scope of the requirements for the GAL as set forth in Sup.R. 48.03 and Juv.Loc.R. 15 and 18. Father brought this to the court's attention in his motion and at trial, and asked the court to strike the entire report. While discussing Father's motion, the GAL clarified that "with regards to the recommendation, the recommendation is a best interest recommendation." (Tr. 283.)

{¶ 66} Ultimately, the court sustained Father's motion in part and denied it in part, striking "anywhere in the report where it talks about change of circumstance." (Tr. 286.) The court noted that "[c]hange of circumstance is a legality that the Court must determine, not the Guardian ad Litem. . . . The Guardian ad Litem is involved in the best interest of the child and reporting to the Court facts and circumstances that the Guardian ad Litem sees that would not be available to the Court." (Tr. 286.) The court believed that "there has been implied best interest [and] . . . any prejudice that would occur from that being stated expressly as the best interest given the fact the circumstance that the Guardian ad Litem reported will be cured by the fact that the Guardian ad Litem will report orally to the Court sometime during this evidentiary hearing at which point in time the parties may ask questions." (Tr. 286-287.)

{¶ 67} Based on the foregoing, we cannot say that the juvenile court abused its discretion when it denied Father's motion to remove the GAL and exclude the GAL's report. The court recognized that the GAL's report contained an improper legal conclusion and struck that portion from the report. The court reasoned that any prejudice would be cured by the fact that the GAL would testify at trial and be subject to examination. The court further reasoned that the GAL report is a tool and it is the court's ultimate determination as what is I.J.'s best interest. As this court has previously stated:

> Although a trial court is generally obliged to consider the recommendation of a child's guardian ad litem, it is "not bound to adopt" it. *In re J.B.*, 8th Dist. Cuyahoga Nos. 98566 and 98567, 2013-Ohio-1706, ¶ 152. The "ultimate decision" is for the trial judge who "must act upon a consideration of all evidence presented." *Id.*, citing *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 34.

*In re K.Z.*, 2019-Ohio-707, at ¶ 78 (8th Dist.).

{¶ 68} Additionally, in this case, the court completed an in camera interview with I.J. where I.J. expressed to the court his wishes as to where he wants to live and where he wants to go to school. And while the GAL may not have notified the court that her recommendation differs from I.J.'s wishes to live with Father and attend Parma Schools, this difference did not prejudice Father because the court was already aware of I.J.'s wishes by virtue of the in camera interview. Therefore, Father's due-process or other constitutional rights were not violated and the court exercised its discretion appropriately.

{¶ 69} Accordingly, Father's second assignment of error is overruled.

**D. The GAL's Fees**

**{¶ 70}** In the fifth assignment of error, Father contends that the juvenile court erred when it granted the GAL's motion for fees without giving Father the opportunity to request a hearing as set forth in Juv.Loc.R. 15(D)(5), which provides that "[u]nless a Hearing is requested by a party or the Court within fourteen days after a Motion for Guardian ad Litem Fees is filed, the Court may rule on the Motion without a Hearing."

**{¶ 71}** "We review a juvenile court's order regarding compensation to a GAL for abuse of discretion." *In re I.L.J. V* at ¶ 13, citing *In re I.A.G.*, 2016-Ohio-3326, ¶ 22 (8th Dist.); *Robbins v. Ginese*, 93 Ohio App.3d 370 (8th Dist. 1994); *Beatley v. Beatley*, 2003-Ohio-4375 (5th Dist.); *Longo v. Longo*, 2014-Ohio-4880, ¶ 18 (11th Dist.).

**{¶ 72}** In the instant matter, the GAL filed a motion for fees on December 4, 2024, requesting that the court release the $1,500 bond on deposit to pay for her fees. On December 13, 2024, the court issued a journal entry ordering that Mother and Father each pay $750 from the bond to the GAL and each post an additional bond of $2,067.50 by January 27, 2025. In response, Father filed a "motion for reconsideration GAL bond release" on December 23, 2024, asking the court to reconsider its decision because the fees were ordered before either party could request a hearing.[1] Father also filed a motion for extension to pay the GAL bond,

---

[1] In our review of the record, it does not appear that the trial court issued a specific ruling on this motion.

which the court denied. Both parties posted the bonds, and no other payments were made to the GAL.

{¶ 73} Then, at the conclusion of the final trial date on February 14, 2025, the parties revisited the GAL's fees. The GAL stated that her final bill was the previous bill she presented to the parties with the addition of trial time. The GAL added "the 12-11 trial date, 5 hours, yesterday's trial time for 7 hours, and today as at 5 hours." (Tr. 720.) The court then noted to the parties that it has "learned in regards to the local rule, you have 14 days to object." (Tr. 720-721.) Father's counsel agreed with the court. A review of the docket reveals that no objection was filed after the final hearing date on February 14, 2025. Then on April 2, 2025, the court issued a journal entry ordering the parties to each pay $3,141.25 in fees to the GAL for the statement period "September 11, 2024, through December 11, 2024/February ____ 2025" and releasing each parent's bond to the GAL. (Journal entry, Apr. 2, 2025.)

{¶ 74} Contrary to Father's assertion, the court did not prematurely rule on the GAL's motion for fees without allowing the parties fourteen days to request a hearing. The record is clear that at the end of the February 14, 2025 hearing, the court specifically advised the parties that they had 14 days to object to the GAL's fee request. Father never filed an objection or requested a hearing. Therefore, it was within the court's authority under Juv.Loc.R. 15(D) to rule on the GAL's motion in April 2025, which was over a month after the 14-day window lapsed. Father's argument is unpersuasive.

{¶ 75} Therefore, the fifth assignment of error is overruled.

**{¶ 76}** Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

MICHELLE J. SHEEHAN, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR